# FRANK MAXA, JR., *v.* THOMAS NEIDLEIN.

[No. 29, October Term, 1932.]

*Decided December 8th, 1932.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*John S. Young,* for the appellant.

*Robert H. Archer* and *Aaron C. Snyder,* with whom were *J. Wilmer Cronin* and *J. Glasgow Archer* on the brief, for the appellee.

URNER, J., delivered the opinion of the Court.

The trial of this action for assault and battery resulted in a verdict and judgment for the plaintiff, and the defendant has appealed. The chiefly contested ruling submitted to the jury, by granted prayers, the plaintiff's claim for punitive damages. No doubt is created by the record as to the propriety of that ruling.

The defendant had been paying attentions to the plaintiff's wife. In an effort to interrupt their objectionable relationship, the plaintiff accosted them as they were alighting from an automobile in Baltimore and were about to enter the home of the wife's brother. What occurred then and subsequently is thus described in the plaintiff's testimony:

"I told him that I saw that he was still running with my wife, and he said that he had just picked her up as she was coming out of the moving pictures. She was sitting there and he told her to get out and go in the house. Q. Did she do that? A. She got out and went into the house, and he followed her in. I went to the door and he said that he would settle with me later. Then I went out, got in my car and started for home; and when I was out on the Philadelphia Road, he pulled around in front of me. Q. You saw him on the Philadelphia Road after you left the house?

A. He pulled right in front of me and stopped. * * * Q. Whereabouts was this? A. It was just outside of Baltimore City. * * * Q. You were headed towards Aberdeen? A. Yes, sir. Q. What happened then? A. He asked me if I was ready to settle with him there and I told him that I would not fight him in Baltimore City, and I said that I was going on up the road. He said that he would follow me anywhere—any place—to settle with me; and I came on up the road to White Marsh. Q. How did you come to stop the second time? A. He asked me if I was ready to settle with him there. Q. Where did he drive? A. In front of me. Q. Did he stop his car a second time? A. Yes, sir. Q. What did he do then? A. He asked me if I was ready to settle with him then, and I told him that I was. Q. What did he do then? A. He stood in front of the lights on the road, and I told him that I had caught him with my wife after I had told him to keep away from her. Then I stepped out into the road and had nothing with me at that time. Then I picked up something out of my car and started for him. Q. What did you pick up? A. I picked up a jack that was lying in the back of the car. Q. Then what happened—did he start to run? A. Started back after him, caught him and we wrestled and fell to the ground. Q. Did you hit him with the jack? A. No, sir. Q. Why not—because he was holding it? A. No, sir. After we wrestled and fell on the ground, I started back for my car; and as I pulled the door open to get in, he hit me. Q. Where did he hit you? A. Right along side the nose. Q. Did he knock you into the road? A. Yes, sir. Q. What was the damage to you? A. He broke my nose and two ribs. Q. What broke your ribs? A. I think he kicked me after I fell. Q. Were you conscious when you fell? A. No, sir. Q. Where was he when you came to? A. He was gone. Q. On which side of the car were you lying when you came to? A. On the left side. Q. In the Philadelphia Road? A. Yes, sir."

The testimony of the plaintiff's physician confirmed his statement as to the nature and extent of his injuries.

The defendant's version of his meeting with the plaintiff in Baltimore and of their encounter on the Philadelphia Road is given in the following extracts from his testimony: "Q. You drove up there in your car and Mrs. Neidlein was with you? A. Yes, sir. Q. Where did you see Mr. Neidlein—from which way did he appear? A. I don't know which way he came from. Q. When did he appear—how soon after you had driven up? A. Immediately. Q. He has testified that he didn't draw a pistol on you there—tell the jury whether or not he did? A. Yes, sir; he did. I had driven up there and was about ready to open the door for Mrs. Neidlein to get out; and, when I turned and looked to the left, he was standing there with a gun poked into my side. Then I got out of my car and he ran around to the other side of the car and tried to hold the door shut so she could not get out. I told him to let her get out and she went on into the house there, and he said, 'All right, I will settle with you later.' * * * Q. Did he leave there before or after you did? A. He left there before I left. Q. When you did leave and whichever way you went, you did get to the stop-light at the crossing of the Baltimore and Ohio Railroad over the Philadelphia Road before he did? A. Yes, sir; I did. * * * Q. Now as to the altercation that you had on the Philadelphia Road—where was it? A. At White Marsh. * * * Q. How did you come out there—who got there first? A. Mr. Neidlein was driving ahead of me, and I was driving somewhere around a hundred and fifty to two hundred yards behind him; and, when we got that far—it was a right dark lonely place—he pulled off to the side of the road. There was no machine coming in the opposite direction, and I pulled in back of him and stopped and I got out and walked towards the front of my car. When I got in the lights of my car, I saw Mr. Neidlein walking towards me. Q. Did he have a pistol in his hand then? A. Yes, sir; he had a pistol in his hand then, and then he immediately ran back, put the pistol up and got a jack. Q. What did he do with that? A. He hit me two or three times—tried to hit me in the face with it. I held up my left hand and he hurt that badly, and I

could not stand that any more, so I tried to get back away from him, and he followed me and we both fell down, and I got possession of the jack. When we got up, I took the jack up along the edge of the road and threw it on the running board of my car. Mr. Neidlein had started to his car, I ran up to him; and, about the time he was ready to get in his car, I hit him. * * * Q. Why did you strike him? A. I was afraid he would get something out of the car. I had only one arm that was good and I had already taken the jack away from him. * * * Q. Did you have any weapon or pistol when you struck him, or did you hit him with a club? A. No, sir; I didn't have anything but this pair of gloves. * * * Q. Now, when you hit him, did he fall? A. Yes, sir. Q. What did you do after that? A. I walked back to my car, stood there a couple of seconds until he got up, and then I jumped in my car and drove off. * * * Q. Did you kick him after he was down? A. No, sir."

As between the narratives of the plaintiff and defendant, concerning incidents to which they alone testified, it was the right and duty of the jury to determine which statement was more worthy of belief. The verdict shows that the jury accepted the plaintiff's version, which unquestionably described an attack upon him by the defendant sufficiently wanton, unprovoked, and excessive to justify an instruction that punitive as well as compensatory damages might be awarded. Zell v. Dunaway, 115 Md. 1, 80 A. 215; Stockham v. Malcolm, 111 Md. 615, 74 A. 569, 19 Ann. Cas. 759; Sloan v. Edwards, 61 Md. 89. While the first of the plaintiff's granted prayers referred only to compensatory damages, but nevertheless permitted the pecuniary circumstances of the defendant to be considered, which, as said in Stockham v. Malcolm, supra, are pertinent only where punitive damages are in issue, yet, as further held in that case, the granting of a prayer in that form is not ground of reversal when, as here, the plaintiff's testimony, if true, supports the theory that exemplary or punitive damages are allowable.

The first six evidence exceptions are abandoned. Exception number eight is immaterial, since it refers to a ruling on

an inquiry which the witness then under examination said he could not answer. The seventh, ninth, eleventh, and twelfth exceptions were taken because of the admission of evidence as to the defendant's pecuniary circumstances. This was a proper subject of inquiry, in view of the issues involved.

The thirteenth and fifteenth exceptions relate to an incident at the home of the defendant's father and mother, in regard to which the defendant had been questioned and had testified without objection on his part, as follows: "Q. Didn't Mr. Neidlein come in there and say to your mother and father that he had caught you in Baltimore with his wife, and in reply to that didn't you say, 'I blacked one of your eyes, and if you don't shut up and get out of here, I will black the other one'? A. Mr. Neidlein came up there and told my mother and father that; and when he got through, I opened the door and told him to get out."

Referring to that occasion, the plaintiff was allowed to testify that, when he told the defendant's mother and father about finding his wife and the defendant together on the previous night, and about the subsequent assault, the defendant "opened the door and told me to get out or he would black my other eye." This testimony was admissible as tending to prove that the defendant's attitude toward the plaintiff had been aggressive.

There was no error in the ruling which is the subject of the fourteenth exception. A witness who had testified to a conversation between the plaintiff and an officer to whom he had first made complaint after the assault was allowed to be recalled and to contradict a specific statement which the officer, testifying for the defendant, quoted the plaintiff as having made in the course of the interview.

The sixteenth exception, relating to the prayers, has already been discussed.

The ground of the remaining exception was the refusal of the court to prevent counsel for the plaintiff, in arguing the case before the jury, from referring to the fact that the plaintiff, on the day of the assault, had found his children alone when he went home, and that he had gone to Bal-

timore and found his wife in the defendant's company. That fact having been proved without objection or dispute, as being immediately involved in the altercation preceding the assault, it could properly be mentioned in the argument.

*Judgment affirmed, with costs.*