TONEY SCHLOSS ET AL. *v.* NATHAN SILVERMAN
[No. 16, April Term, 1937.]

*Decided May 31st, 1937.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Raphael Walter* and *David S. Sykes,* with whom were *Nyburg, Goldman & Walter* on the brief, for the appellants.

*Joseph R. Hirschmann,* with whom was *Daniel Ellison* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

Toney Schloss and Dan Schloss, copartners, trading as the Baltimore Lumber Company, conduct a lumber business in Baltimore City. Nathan Silverman is a carpenter

and builder. At 10 o'clock in the morning of March 31st, 1936, Silverman was engaged in making some alterations for one Erick Faven in a building at Dallas and Fayette Streets in that city. While he was so engaged, Dan Schloss, one of the partners, appeared at the building and, as the consequence of an altercation between them, struck and injured Silverman. Shortly thereafter Silverman brought this action for assault and battery against the partnership and against Toney Schloss and Dan Schloss, both as members of the partnership and as individuals. The trial before the court and a jury in the Superior Court of Baltimore City resulted in a verdict and judgment for the plaintiff against all of the defendants, and from that judgment this appeal was taken.

The evidence in the case was legally sufficient to permit the jury to find facts which, stated in narrative form, are as follows: In March, 1936, prior to the encounter between Dan Schloss and Silverman, Silverman had asked the Baltimore Lumber Company for an estimate on the lumber needed for the work which he had undertaken at Dallas and Fayette Streets. At the same time he borrowed from them lumber to prop the building, and deposited with them five dollars, which the company was to keep for the use of the lumber if it did not eventually receive an order for the material. It did not receive the order, but Silverman did use the props on the work. When Dan Schloss appeared on March 31st, 1936, Silverman and two bricklayers were "on the scaffold working." Schloss called to him: " 'Hey, Silverman, you didn't give me that order, did you?' And he replied, 'No sir, I gave it to the American Lumber Company.' " Schloss cursed Silverman and went away, but returned about ten minutes later, accompanied by two colored men, in a truck. He jumped from the truck and with a 4x4 piece of timber "started hammering on the corner prop supporting the second and third floors." Silverman warned him that he was endangering the occupants of the second and third floors of the adjoining house, and descended from

the scaffold to find an officer. He failed to find an officer and returned. When he returned he heard Schloss instruct one of the colored men to hammer on the prop. Then, to quote Silverman's testimony: "And while I was looking up to see if the building was cracked, he smacked me right from the back and knocked me down. I felt the blood—he split my head, and blood was running down over my face, and I got up—I was dizzy, and he smacked me again and knocked me down again." Schloss then left in the truck, and Silverman was taken to a physician, who treated him for his injuries. The props supporting the building were those which Silverman had borrowed from Schloss.

Another description of the occurrence was given by Vernall Wyatt, who said: "This gentleman (indicating Silverman) was simply standing with his back turned, looking up at the building, and this other gentleman walked up behind him and hit him and knocked him down, and this gentleman (indicating Silverman) didn't make no ambitions at all to hit him, he looked like he was scared, and he did go around the corner like he was looking for an officer. * * * He (Schloss) hit him first, struck him and knocked him out, and this guy (Silverman) jumped up, and then he ran and grabbed him and mugged him, like." She also said that when Schloss drove off, Silverman was "bleeding terribly."

Dan Schloss, when called by the plaintiff, said that he was "in charge of the office" even when he was "up where the construction job was under way," and that he "thought" his father (presumably Toney Schloss) knew that Silverman had borrowed the props. Testifying for the defendants, the same witness said that, after he had given Silverman an estimate based upon blueprints furnished by Silverman, Silverman told him to proceed with the order, and that certain "frames" were actually supplied under it, that the props were loaned on the "strength" of the order, that some days later he went to "his job" to inquire when Silverman wanted the lumber, that he saw their props in use, and other lumber

on the pavement which they had not shipped. He then told Silverman that "he does a very dirty trick to secure the lumber somewhere else and use our props, and I told him I was coming back for them, and to have them ready. It wasn't but ten minutes or so later that I came back in our truck and stopped directly in front of the building, and said, 'Mr. Silverman, can I have my props?' and he said 'No.' " The witness further said: "And there ensued an argument, and I walked to the truck and took a short piece of lumber that I was going to use for the sole purpose of intimidating him to give back the props." He then said he had struck Silverman in defending himself, and that he was not the aggressor.

At the close of the whole case the plaintiff offered two prayers, which were granted; the defendant Dan Schloss four, of which the first and third were granted, the fourth modified and granted, and the second refused; and Toney Schloss individually and Toney Schloss and Dan Schloss, trading as the Baltimore Lumber Company, five, of which the first and third were refused, the fourth and fifth granted, and the second modified and granted.

The record submits five exceptions; the fifth relates to these rulings on the prayers; the others to rulings on questions of evidence.

The important question presented by the appeal is raised by the refusal of the first prayer offered by Toney Schloss and Toney Schloss and Dan Schloss, trading as the Baltimore Lumber Company. That prayer was a demurrer to the evidence relating to the liability of Toney Schloss and the partnership for the harm caused to Silverman by acts of Dan Schloss. It is based on the theory that the act of Dan Schloss in assaulting and beating Silverman was not within the scope of his authority as a member of the partnership, that it was not expressly authorized by the partnership nor by Toney Schloss, and that in the absence of authority express or implied from Toney Schloss or the partnership, neither was liable for such unauthorized acts of Dan Schloss.

The appellee, on the contrary, contends that the bat-

tery was committed by Dan Schloss in the course and promotion of partnership business, that therefore the partnership was liable for harm caused thereby to the plaintiff, and that as a legal consequence each of the partners was also liable individually for such harm.

The liability of one copartner for the tortious acts of another is analogous to the liability of a principal for the acts of his agent, since each partner acts both as principal and as the agent of the other as to acts done within the apparent scope of the business and purpose of the partnership and for its benefit. 1 *Rowley on Partnership,* secs. 509, 485; 47 *C. J.* 884; 20 *R. C. L., Partnership,* secs. 94, 126. The test of the liability of the partnership and of the several members thereof for the torts of any one partner is whether the wrongful act was done within what may be reasonably found to be the scope of the business of the partnership and for its benefit (*Ibid; Cooley on Torts,* sec. 88), and the scope of the authority of a partner is determined by the same principles as those which measure the scope of an agent's authority.

It has been said that that general rule is not applicable to the liability of one partner for the willful and malicious torts of another (*Cooley on Torts,* sec. 88), because such torts cannot be considered as within the usual scope of partnership business. *Ibid.* But it is not altogether certain that the general rule is not applicable to such cases, because the conclusion that willful and malicious wrongs are not within the scope of an ordinary partnership may be a mere factual inference. The case of *McIntyre v. Kavanaugh,* 242 U. S. 138, 139, 37 S. Ct. 38, 39, 61 L. Ed. 205, cited as in apparent conflict with the rule that willful and malicious torts are not to be considered as within the usual scope of the business of an ordinary partnership, does not go as far as that. The court there was dealing with a case in which a partnership engaged in business as brokers wrongfully converted certain securities. Thereafter the firm and its members were adjudged bankrupts. The depositor then sued one

of the partners, who pleaded his discharge, personal ignorance of and nonparticipation in any tortious act. The court there said: "That partners are individually responsible for torts by a firm when acting within the general scope of its business, whether they personally participate therein or not, we regard as entirely clear. *Castle v. Bullard,* 23 How. 172, 16 L. Ed. 424; *In re Peck,* 206 N. Y. 56, 99 N. E. 258. If, under the circumstances here presented, the firm inflicted a wilful and malicious injury to property, of course, plaintiff in error incurred liability for that character of wrong." That case turned upon the fact that the tort was actually within the general scope of the partnership business, and is not inconsistent with the rule that a willful and malicious tort is not within the usual scope of an ordinary partnership. If the tortious act is a partnership act, it must also be severally the act of the partners; but if it is willful and malicious, and done by one of the partners without the knowledge or consent of the others, and not for the benefit or purposes of the partnership, it will not be considered as within the usual scope of an ordinary business partnership. In the case last cited the partnership received the securities, and the partnership appropriated them wrongfully to its use, sold them, deposited the proceeds to its credit, and used them as its funds. That those transactions were partnership business was not a matter of inference, but was shown by direct and unequivocal proof. But whether regarded as an exception to the general rule, or as a mere application of it to appropriate facts, the weight of authority supports the view that, where one partner commits a willful and malicious tort not within the scope of the agency or the common business of the partnership, to which the other members have not consented, and which has not been ratified, they are not liable for harm thereby caused. 20 R. C. L. 914; 47 C. J. 886; *Rowley on Partnership,* sec. 512; *Kirk v. Garrett,* 84 Md. 383, 409, 35 A. 1089, 1092; *Polis v. Heizmann,* 276 Pa. 315, 120 A. 269; *Titcomb v. James,* 57 Ill. App. 296; *Noblett v. Bartsch,* 31 Wash. 24,

71 P. 551; *Idom v. Weeks & Russell,* 135 Miss. 65, 99 So. 761; *Page v. Citizens' Banking Co.,* 111 Ga. 73, 36 S. E. 418; *Petrie v. Lamont,* Car. & M. 93, 174 Eng. Reprint, 424. For, as stated in *Kirk v. Garrett, supra:* "One partner has no power to bind the partnership to the commission of a wrongful act without the previous consent or subsequent concurrence of all the partners. *Petrie v. Lamont,* Car. & M. 96. If the act complained of is done by one partner for the benefit of the firm, and the firm afterwards takes advantage of it, and adopts the transaction, all the members of the firm may then become responsible for the act and its consequences. 2 *Addison, Torts,* sec. 1321. If all the partners join in one trespass or tort, they may all be sued for the injury, not because they are partners, but because the right of action arises from their personal misconduct. 'In general,' says *Collyer Partnership,* sec. 457, 'acts or omissions in the course of the partnership trade or business, in violation of law, will only implicate those who are guilty of them.' And in *Parsons, Partnership,* sec. 140, the rule is succinctly stated in this way: 'If the firm is merely the occasion for a partner's tort, but not the agency in its commission, the co-partners are not liable.' " That decision was expressly approved in *Bernheimer v. Becker,* 102 Md. 250, 254, 62 A. 526, 528, where the court said: "If the court below intended, by granting the plaintiff's second prayer, to authorize the jury to find a verdict against Ferdinand Bernheimer because his copartner, Herman Bernheimer, was present at and abetted the detention and search of the plaintiff, if they found the fact of such presence and abetting, that, also, was error; for a partner in an ordinary mercantile business has no implied power to bind his copartner in such transactions as those which form the basis of the present suit." In *Petrie v. Lamont, supra,* Tindal, C. J., summing up to the jury, gave this somewhat blunt statement of the rule: "The language of the distress warrant is this: 'For Lamont, Stewart & Co.' The question is, Can he do this? One

partner cannot drag another into a trespass without his previous consent or without his after concurrence."

The facts of *Polis v. Heizmann, supra,* bear a rather close analogy to those involved in this case. There two brothers as partners proposed to carry on a piggery on a small farm which the plaintiff leased to them for that use. The municipal authorities intervened and prevented the use of the property for that purpose. Thereupon one of the brothers went upon the property to remove some lumber, and in an altercation over his right to do so he struck and injured the plaintiff. The other partner was not present, and neither authorized nor ratified the assault. In denying the liability of the other partner the court there said: "The injury here is charged and shown to have been maliciously and wantonly inflicted by willful and intentional violence, in extent and character such as would constitute the crime of aggravated assault and battery. A partnership relation in a lawful enterprise will not render one partner liable for the intentional criminal act of another. The liability of the absent partner is based on the theory of agency; but an agent's wanton criminal act will not bind his principal. The true rule is that: 'A tort committed by one partner will not bind the partnership or the other copartner, unless it be either authorized or adopted by the firm, or be within the proper scope and business of the partnership.' 38 *Cyc.* 481."

From all the evidence in the case it affirmatively appears without contradiction that Toney Schloss was not present when the assault occurred, that he was not at the office when Dan Schloss paid his second visit to the place where Silverman was working, and while it may be inferred that he knew that Silverman had borrowed the props, it does not appear that he knew that Dan Schloss had gone to take them from Silverman, or that he or the firm in any way assented to, ratified, or approved the conduct of Dan Schloss in assaulting Silverman, nor does it appear that Dan Schloss had any authority to bind either the partnership or Toney Schloss other than that usually exercised

by a member of an ordinary business partnership. If the assault on Silverman occurred as he described it, it was a wanton, malicious, and brutal attack on an inoffensive man who was unconscious that it was even threatened, but it had no possible connection with the return of the props, the partnership property, but was merely an act of personal vengeance and malice. Silverman testified that, at the time, he was not interfering with the work of Schloss' men in hammering at the props, but was watching it without comment or protest of any kind. He said that he had at first warned Schloss that the removal of the props might endanger persons in the adjoining building, and had gone for an officer, but that after that he did nothing. Schloss himself gave a different description of the occurrence, but if his statement is accepted as true, in striking Silverman he acted in self-defense, in which case neither he nor the firm nor Toney Schloss would be liable. If the assault had occurred in an effort to secure possession of the firm's property, it might well be argued that the assault was the act of the partnership; but the evidence of Silverman conclusively negatives that theory, so that whether his evidence is true, or whether the evidence of Dan Schloss is true (since it is inconsistent with the liability of either the partnership or the partners), the first prayer of Toney Schloss, individually, and Toney Schloss and Dan Schloss, trading as the Baltimore Lumber Company, instructing the jury to find for those defendants, should have been granted.

The plaintiff's second damage prayer instructed the jury that if the plaintiff was injured by the "defendant" and the assault was wanton, unprovoked, and excessive, they might award such damages as they might think proper to punish the "defendant." It made no provision for compensation, but dealt only with punitive damages. Compensation and punishment are different things (*Sedgwick on Damages,* secs. 357, 360), and it is generally held that punitive or exemplary damages cannot be recovered without proof of actual loss. *Ibid,* 161; 17 *C. J.* 974. The prayer therefore should have instructed the

jury both as to compensatory and exemplary damages, as was done in *Philadelphia, W. & B. R. Co. v. Larkin,* 47 Md. 155, 158, or *Thillman v. Neal,* 88 Md. 525, 526, 42 A. 242. A similar prayer was held to be objectionable in *Balto. & O. R. Co. v. Strube,* 111 Md. 119, 121, 129, 73 A. 697; but as the jury were properly instructed as to the elements to be considered in estimating compensatory damages by the plaintiff's first prayer, it cannot be assumed that they were misled by the circumstance that the instruction as to exemplary and compensatory damages was given separately in two prayers instead of in one.

Since it has been held that the first prayer of Toney Schloss individually and Toney Schloss and Dan Schloss, trading as the Baltimore Lumber Company, should have been granted, it becomes unnecessary to consider the third prayer offered by those defendants.

The first three exceptions relate to the action of the trial court in allowing the plaintiff to interrogate Dan Schloss as to the net worth of the partnership and of his share therein. It is well settled that where exemplary damages may be allowed, it is permissible to show the wealth and financial condition of the defendant. *Sloan v. Edwards,* 61 Md. 89; *Groh v. South,* 121 Md. 639, 89 A. 321; *Maxa v. Neidlein,* 163 Md. 366, 370, 163 A. 202. The plaintiff was therefore entitled to show the value of the defendants' interest in the partnership, and, as that could not be ascertained without also showing the net worth of the partnership, since the value of a part would naturally depend upon the value of the whole, the evidence as to the net worth of the partnership and of the interests of each of the defendants therein was properly admitted.

It follows from what has been said that the judgment against Toney Schloss and against Toney Schloss and Dan Schloss, trading as the Baltimore Lumber Company, must be reversed without a new trial. In view of that conclusion it becomes necessary to decide whether the judgment against Dan Schloss should not also be reversed. By chapter 229, Acts of 1920, this court may, where there

is a judgment against several defendants, affirm the judgment as to one or more and reverse it as to the others (Code, art. 5, sec. 26; *Myers v. Shipley,* 140 Md. 380, 382, 116 A. 645; *McNamara v. Pabst,* 137 Md. 468, 475, 112 A. 812; *Pollock v. Watts,* 142 Md. 403, 407, 121 A. 238; *Canton Co. v. Seal,* 144 Md. 174, 183, 125 A. 63; *Kvedera v. Mondravisky,* 149 Md. 374, 131 A. 766; *Cumberland Transit Co. v. Metz,* 158 Md. 424, 456, 149 A. 4, 565; *Rent-A-Car Co. v. Globe & Rutgers Fire Ins. Co.,* 158 Md. 169, 186, 148 A. 252), or reverse as to all or affirm as to all, accordingly as it determines that the one course or the other will best promote the ends of justice.

The plaintiff's evidence, if true, unquestionably was sufficient in law to permit him to recover against Dan Schloss individually, and if the case were one in which compensatory damages only were recoverable, the judgment against him should be affirmed. But under the instructions of the court the jury was allowed, and properly allowed, to award exemplary damages. But those instructions applied not only to Dan Schloss but to Toney Schloss and to the partnership, and the evidence showed a wide disparity in the financial worth of those defendants. It showed that the financial worth of the partnership was $68,038.78; the financial worth of Dan Schloss' interest in it but $7,686.17. The jury may therefore, in awarding exemplary damages and determining the amount which would sufficiently punish the defendants, have been influenced by the net worth of the two individual defendants and the partnership. And since it cannot be assumed that they attempted to make the "punishment fit the crime," rather than the offenders, it does not follow that they would have awarded the amount in exemplary damages against one defendant worth less than $8,000, that they did against three worth over $68,000. That doubt is increased by the misleading character of the plaintiff's second prayer, which measured the amount of exemplary damages which the jury might award, by what they might think proper "to punish such conduct and deter the defendant from like conduct in the

future." Since there were two individual defendants and the partnership, the jury, in view of the evidence, may well have thought that in determining what was proper to punish one defendant they might consider the financial worth of the partnership and both individual defendants.

Because of that doubt it would be manifestly unjust to affirm the judgment against Dan Schloss and reverse it as to the other defendants; therefore the judgment against him will also be reversed and a new trial awarded in his case.

> *Judgment against Toney Schloss and Toney Schloss and Dan Schloss, trading as the Baltimore Lumber Company, reversed without a new trial; judgment against Dan Schloss reversed and new trial awarded; the costs in this court to be paid by the appellee.*