KELSEY–SEYBOLD CLINIC, Petitioner,

v.

John Dale MACLAY, Respondent.

No. B–2269.

Supreme Court of Texas.

April 28, 1971.

Rehearing Denied June 2, 1971.

Fulbright, Crooker, Freeman, Bates & Jaworski, Dan Matthews, Newton Gresham and Robert M. Welch, Jr., Houston, for petitioner.

Austin, Dabney & Northrop, Robert Dabney, Jr., Houston, for respondent.

WALKER, Justice.

This is a suit for alienation of affections in which the trial court rendered summary judgment for one of the defendants, Kelsey-Seybold Clinic, a medical partnership. The question to be decided is whether the Clinic established conclusively that it is not liable for the damages alleged to have been caused by the acts of one of the partners.

The suit was brought by John Dale Maclay against Dr. Earl J. Brewer, Jr., M.D. and the Clinic. After sustaining the Clinic's motion for summary judgment, the trial court ordered that this part of the case be severed from the suit against Dr. Brewer. Plaintiff appealed to the Court of Civil Appeals, which reversed the trial court's judgment in favor of the Clinic and remanded the cause for trial. 456 S.W.2d 229.

Our statement of the pleadings and summary judgment proofs is taken largely from the opinion of the Court of Civil Appeals. Plaintiff alleged that Dr. Brewer and the Clinic had treated him, his wife and their children for several years; that Dr. Brewer, who is a pediatrician and one of the partners in the Clinic, was the doctor to whom his wife had taken their children; that beginning in late 1966, Dr. Brewer conceived and entered into a scheme to alienate the affections of plaintiff's wife, Mrs. Maria Maclay; that he showered his attentions and gifts upon her until April or May, 1967, when her affections were alienated as a direct result of his actions, causing her to separate from plaintiff on or about July 25, 1967.

Plaintiff further alleged that Dr. Brewer's actions designed to alienate Mrs. Maclay's affections occurred while he was acting as a medical doctor for plaintiff's family and in the course and scope of his employment as a partner in the Clinic; that various acts of undue familiarity occurred both on and off the premises of the Clinic; that prior to April, 1967, the Clinic, through Dr. Mavis Kelsey, one of the senior partners, had knowledge of Dr. Brewer's actions; that at the time this knowledge was acquired, the Clinic was providing medical treatment for plaintiff and his entire family; and that "the partnership approved of, consented to, and ratified and condoned such conduct of its partner, Brewer, and refused to come to the aid of your plaintiff or in any way attempt to halt or disapprove the actions of Brewer. * * *" Plaintiff prayed for the recovery of damages, both actual and exemplary, from Dr. Brewer and the Clinic, jointly and severally.

The summary judgment proofs consist of two affidavits and three depositions. Two of the depositions contain nothing that is relevant to this appeal. The third deposition is that of Dr. Mavis Kelsey, who is Chairman of Staff for the Clinic. Dr. Kelsey stated that he had treated plaintiff ten or fifteen years before and that other doctors in the Clinic had treated plaintiff, his wife and children since then. At some time in the Spring of 1967, plaintiff complained to Dr. Kelsey that Dr. Brewer was

having an affair with Mrs. Maclay. According to Dr. Kelsey's recollection of this conversation, plaintiff stated that he and his wife had separated. At about the same time Dr. Kelsey received a telephone call from Mrs. Maclay's uncle, who inquired what Dr. Kelsey "knew about this affair." Two or three weeks later plaintiff telephoned Dr. Kelsey a second time.

It was Dr. Kelsey's impression that the purpose of plaintiff's two telephone calls was to seek sympathy. Plaintiff did not ask him to do anything, and he had done nothing. He did not talk with Dr. Brewer about the matter until after this suit was filed. The witness did not believe that anything improper had occurred at the Clinic. If anyone had known of conduct such as that alleged by plaintiff, the partners "wouldn't put up with that." Dr. Kelsey also stated that the Clinic had not adopted a policy of intentionally alienating Mrs. Maclay's affections. A nurse is always present when a female patient is examined or treated by a doctor in the Clinic, but Dr. Kelsey felt that it would be impossible to keep up with the private lives, outside the Clinic, of over fifty doctors.

Plaintiff countered with an affidavit in which he stated that in his telephone conversation with Dr. Kelsey, he inquired whether the latter was aware that Dr. Brewer had a romantic interest or involvement with his wife. According to the affidavit, Dr. Kelsey replied that he was aware of the matter and had talked with Mrs. Maclay's uncle about it. The Clinic filed an affidavit by all members of its executive committee, except Dr. Brewer, stating that the committee is charged with responsibility for setting policy for the partnership, that the business of the partnership is that of operating a medical clinic, that Dr. Brewer was not authorized by the partnership at any time to do any act which might result in the alienation of Mrs. Maclay's affections from her husband, and that the partnership had done no act with the purpose, intent or design to alienate her affections.

As pointed out by the Court of Civil Appeals, the ultimate question is whether the summary judgment proofs conclusively negate at least one of the essential elements of plaintiff's cause of action. Gibbs v. General Motors Corp., Tex.Sup., 450 S.W. 2d 827. Here the Clinic concedes, for purposes of the summary judgment and this appeal: (1) that Dr. Brewer was a partner in the Clinic; (2) that the members of the Maclay family were patients of the Clinic; (3) that Dr. Brewer alienated Mrs. Maclay's affections; and (4) that plaintiff informed Dr. Kelsey in about April, 1967, that an improper relationship existed between Dr. Brewer and Mrs. Maclay. It insists, however, that the record establishes as a matter of law that the Clinic is not liable for the damages alleged to have resulted from Dr. Brewer's acts.

The bases of liability alleged in the petition are: (1) that Dr. Brewer's wrongful conduct was in the course and scope of the partnership business and was approved, consented to, ratified and condoned by the Clinic; and (2) that the Clinic, after notice of the alleged relationship between Dr. Brewer and Mrs. Maclay, failed to take any action. Plaintiff is thus relying upon the vicarious or partnership liability of the Clinic for the acts of one of the partners and also its liability for breach of a duty owing by the Clinic when it learned of Dr. Brewer's relationship with Mrs. Maclay.

On the question of vicarious liability, plaintiff argues that the affidavit of the members of the Clinic's executive committee will not support a summary judgment since it comes from interested parties and contains mere conclusions. No attempt will be made to consider this contention, because the judgment of the Court of Civil Appeals must be affirmed for other reasons that will be discussed below. We are unwilling to believe that plaintiff seriously expects to prove in a conventional trial that the acts alleged to have been committed by Dr. Brewer were in the course and scope of the partnership business or were either authorized or ratified by the Clinic.

Rather than concern ourselves about possible deficiencies in the affidavit filed by the Clinic, we assume for the purpose of this opinion that Dr. Brewer was not acting in the ordinary course of the Clinic's business and that his conduct was neither authorized nor ratified by the partnership. This will enable us to reach questions that may well arise at the trial of the case.

The Court of Civil Appeals reasoned that the summary judgment was improper because the Clinic had not conclusively negated consent on its part to the alleged wrongful conduct of Dr. Brewer. In reaching this conclusion, it relied on our opinion in K & G Oil Tool & Service Co. v. G & G Fishing Tool Service, 158 Tex. 594, 314 S.W.2d 782, where it was stated that:

> "A non-participating partner is ordinarily not personally liable for the wrongful, tortious or criminal acts of the acting partner unless such acts are within the scope of the partnership's business or were consented to, authorized, ratified or adopted by the non-participating partner."

There was no question of consent in K & G, and it was held that the non-participating partner was not liable. Similar statements have been made by other courts in connection with similar holdings. See Schloss v. Silverman, 172 Md. 632, 192 A. 343; Vrabel v. Acri, 156 Ohio St. 467, 103 N.E.2d 564, 30 A.L.R.2d 853. Two courts apparently entertain the view that mere tacit consent is enough to make the non-participating partner liable for the wilful tort of the acting partner outside the scope of the partnership business. Polis v. Heizmann, 276 Pa. 315, 120 A. 269; Dulchevsky v. Solomon, 136 Wash. 645, 241 P. 19. Their conclusion in this respect appears to be due, at least in part, to an erroneous interpretation of the opinion in Williams v. F. & W. Grand Five, Ten and Twenty-five Cent Stores, 273 Pa. 131, 116 A. 652. The plaintiff there was accused of stealing a tooth brush. While being interrogated in defendant's store, she was assaulted by the operative of a private detective agency employed by defendant to guard the store. The trial court rendered judgment on the verdict in favor of the plaintiff, and it was contended on appeal that defendant could not be responsible for an assault committed by the employee of an independent detective agency. The appellate court pointed out that the jury had been instructed to find for the plaintiff if they believed that the manager of the store was present and participated in the acts or permitted the operative to insult and assault the plaintiff when he could and should have protected her. It then observed that the defendant was held responsible not for the acts of the operative but for those of its own manager.

■ Where a partner proposes to do, in the name or for the benefit of the partnership, some act that is not in the ordinary course of the business, consent by the other partners may constitute his authority to do the act for the partnership. See Restatement, Second, Agency §§ 7, 27. We also recognize that even a wilful or malicious act outside the ordinary scope of the partnership business may be so related to the business that tacit consent of the other partners could fairly be regarded as a grant of authority. In this instance, however, Dr. Brewer was acting solely for his own personal gratification. His conduct could not benefit the Clinic in any way, and no one would have supposed that he was acting for the partnership. It is our opinion that in these circumstances the "consent" that might be inferred from the silence or inaction of the Clinic after learning of his conduct does not render the Clinic vicariously liable for the damages claimed by plaintiff.

■ On the basis of the present record and the facts we are assuming in this case, the liability of the Clinic must rest, if at all, upon some theory akin to that recognized by the court in *Williams*. The Clinic was under a duty, of course, to exercise

ordinary care to protect its patients from harm resulting from tortious conduct of persons upon the premises. A negligent breach of that duty could subject the Clinic to liability without regard to whether the tortious conduct immediately causing the harm was that of an agent or servant or was in the ordinary scope of the partnership business. For example, it might become liable, as a result of its own negligence, for damage done by a vicious employee while acting beyond the scope of his authority. See Restatement, Second, Agency, § 213.

■■ We are also of the opinion that the Clinic owed a duty to the families of its patients to exercise ordinary care to prevent a tortious interference with family relations. It was not required to maintain constant surveillance over personnel on duty or to inquire into and regulate the personal conduct of partners and employees while engaged in their private affairs. But if and when the partnership received information from which it knew or should have known that there might be a need to take action, it was under a duty to use reasonable means at its disposal to prevent any partner or employee from improperly using his position with the Clinic to work a tortious invasion of legally protected family interests. This duty relates only to conduct of a partner or employee on the premises of the Clinic or while purportedly acting as a representative of the Clinic elsewhere. Failure to exercise ordinary care in discharging that duty would subject the Clinic to liability for damages proximately caused by its negligence. See Restatement, Second, Torts, § 317.

■ The rather meager information in the present record does not necessarily indicate that the Clinic was under a duty to act or that it could have done anything to prevent the damage when Dr. Kelsey first learned of the situation. On the other hand, it does not affirmatively and clearly appear that the Clinic could or should have done nothing. Mrs. Maclay's affections

may have been alienated from her husband before anyone talked with Dr. Kelsey, but the facts in that respect are not fully developed. There is no proof as to when, where or under what circumstances the misconduct, if any, on Dr. Brewer's part occurred. Dr. Kelsey testified that he did not believe anything improper occurred at the Clinic, but the proofs do not establish as a matter of law that he was justified in not making further inquiry after his conversations with plaintiff and Mrs. Maclay's uncle. The record does not show whether there is a partnership agreement that might have a bearing on the case, and we have no way of knowing the extent to which the Clinic might have determined which patients were to be seen by Dr. Brewer or controlled his actions while on duty. Dr. Kelsey's testimony suggests that the partners might have been in a position to prevent improper conduct by one of their number on the premises of the Clinic. In our opinion the Clinic has failed to discharge the heavy, and in a case of this character virtually impossible, burden of establishing as a matter of law at the summary judgment stage that it is not liable under any theory fairly presented by the allegations of the petition.

The judgment of the Court of Civil Appeals is affirmed.

Dissenting opinion by GREENHILL, J., in which McGEE, J., joins.

DENTON and DANIEL, JJ., not sitting.

GREENHILL, Justice (dissenting).

I am unable to agree that the partners of Dr. Brewer or the Kelsey Clinic are even potentially liable.

This suit was brought by a husband for the alienation of his wife's affections. The acts alleged to have occurred were not any sort of assault or battery as in the *Williams* case from Pennsylvania relied upon by the majority opinion. The alleged

acts involved here between Dr. Brewer and the plaintiff's wife were between consenting adults; and obviously, they were committed in secret. The majority opinion correctly finds that Dr. Brewer was acting solely for his own personal gratification; that his conduct could not benefit the clinic in any way; and it assumes that his conduct was neither authorized nor ratified by the partnership. The Uniform Partnership Act provides for liability of the partnership for wrongful acts of a partner "acting in the ordinary course of the business of the partnership." Article 6132b, § 13, Vernon's Annotated Civil Statutes. I find no such action here.

The tort of alienation of affection is not one which is universally accepted. It has been abolished in several states by legislative act. See Rotwein v. Gersten, 160 Fla. 736, 36 So.2d 419 (1948), and Grobart v. Grobart, 5 N.J. 161, 74 A.2d 294 (1950). In some states, the cause of action for damages, (and most of the damages recovered are exemplary or punishing damages rather than actual damages), has been abolished; but a remedy by injunction has remained. See 41 Am.Jur.2d § 463. The annotation in 158 A.L.R. says at page 618 that New York has abolished alienation of affection because it "has been subjected to grave abuses, causing extreme annoyance, embarrassment, humiliation and pecuniary damage to many persons wholly innocent and free of any wrongdoing, who were merely the victims of circumstances, and such remedies having been exercised by unscrupulous persons for their unjust enrichment, and such remedies having furnished vehicles for the commission . . . of crime and in many cases having resulted in the perpetration of frauds. . . ."

At least some of those who defend the cause of action for alienation of affection concede that its application "should no doubt be somewhat limited." Brown, The Action for Alienation of Affection, 82 Penn.L.Rev. 472 at 506 (1924); Feinsinger, Legislative Attack on "Heart Balm," 33 Mich.L.Rev. 978 (1935).

It is not necessary here, in my opinion, to consider whether a cause of action for alienation of affection should be abolished because the suit against Dr. Brewer has been severed. But as I read the plaintiff's petition, his suit *is* one for alienation of affection; and the question is whether a cause of action for alienation of affection should be extended to each of the members of a partnership consisting of some 30 doctors, or 15 architects, or 60 lawyers, or any other type of partnership, where none of the partners are even alleged to have had anything to do with the conduct of the consenting adults involved. The prayer is specifically that the partnership and Dr. Brewer pay the plaintiff a million dollars "because of the loss of consortium and affections of his wife," and not for any other tort. My dissent is to what I regard as the extension of the tort of alienation of affection (by whatever name it is called) to people outside of those who actively, intentionally and maliciously participate in it, and whose acts actually produce the alienation.

The majority opinion, ably written, talks about interfering with *family* relations. The cause of alienation of affection is *not* one on behalf of the family. It is a cause of action for damages to the offended spouse only:—the loss *to him* of the affection and conjugal relations of his wife. For example, in Garza v. Garza, 209 S.W. 2d 1012 (Tex.Civ.App.1948, no writ), the *children* of a marriage sued "the other woman" and their father because the other woman had alienated the affection of their father from their mother; and among other things, they lost the affection of their father and his financial support. The trial court, finding no judicial precedent to support a judgment for the plaintiffs, admittedly engaged in "lawmaking by decision;" and based on "the law of God * * * since the dark ages," rendered judgment for the children for the alienation of the affection of their father. The court of civil appeals reversed and rendered judgment for the defendants. It reasoned that other remedies were available for the prop-

er support of the children; and that the alienation of affection suit was really based on the loss of consortium of the spouse. It's a personal affair, not a suit for damages to the family.

A search of the books will reveal a great scarcity of cases involving a conspiracy of several people to alienate the affections of a spouse or cases which attempt to make several people joint tort-feasors. Nobody, so far as I have been able to ascertain, has ever brought such a case as this to an appellate court. There are cases where a husband has sued the parents of his wife for causing the wife to separate from the husband. In all of such cases, the parents, guardians, or relatives of the wife have been active participants in the alleged malicious alienation; and where they are not active participants, there is no cause of action against them. Even in such cases, the parents have some rights; and they are liable only if they act maliciously, without justification, from unworthy motives, and if their acts were the controlling cause of the alienation. The cases are collected in 41 Am.Jur.2d § 473 and in an annotation, 108 A.L.R. 408. The same rule applies where it is alleged that members of a church were alleged to have wrongfully persuaded the wife to leave her husband and to have caused the alienation of her affections from her husband. Hughes v. Holman, 110 Or. 415, 223 P. 730 (1924); Annotation 31 A.L.R. 1115.

The tort of alienation of affection is based on an intentional and malicious act of the defendant or defendants. It is not enough that the acts be the result of negligent conduct; i. e., as applicable here, that the other 29 partner-doctors of the Kelsey Clinic were negligent in not interfering. Thus in Lilligren v. Wm. J. Burns International Detective Agency, 135 Minn. 60, 160 N.W. 203 (1916) a husband, suspecting his wife of being unchaste, employed the defendant detective agency to follow his wife and to report to him. The agency negligently followed the wrong lady; and the lady who was followed led a very gay life.

The agency reported its [erroneous] findings to the husband, the husband accused his wife, she was insulted, and she left her husband. The husband then sued the detective agency for the loss of the affections of his wife. *Held,* "the action is for an intentional, not merely a negligent tort."

In summary, as I read the pleadings and the depositions on file, there are no relevant issues of fact and no basis in law for holding the partners liable for the secret acts of a partner with a consenting adult completely outside of the business of the partnership. Negligent acts will not give rise to damages for alienation of affection, and the record, at least to me, completely negatives any intentional, malicious acts by any of the partners except Dr. Brewer, which could have been the controlling cause of the alienation of affection involved.

I would affirm the judgment of the trial court.

McGEE, J., joins in this dissent.