# WILLIAM J. CHAPMAN and G. WALTER CHAPMAN

## *vs.*

## CHARLES CARROLL NASH, Infant, by His Father and Next Friend, Charles M. Nash.

*Prayers: "no evidence"; duty of the Court; malicious prosecution; want of probable cause. Malice.*

Where, at the end of all the evidence, both of the plaintiff and the defendant, the defendant prays for an instruction directing a verdict in his favor, on the ground that the plaintiff has offered no evidence legally sufficient to establish his case, on appeal, the Court must consider the whole evidence and not that of the plaintiff alone.　　　　　　　　　　　　p. 610

Such a prayer amounts to a demurrer to the whole evidence, and the Court, in dealing with it, must assume the truth of the facts adduced in support of the plaintiff's case.　　　p. 610

In such a case, the Court may consider other facts appearing in the record that have been proved, and not denied by the plaintiff.　　　　　　　　　　　　　　　　　　p. 610

In order to enable a plaintiff to recover in a suit for malicious prosecution, in addition to the fact that he was prosecuted and acquitted, he must show that he was prosecuted at the instance of the defendant, and that such prosecution was both malicious and without probable cause on his part.　　　p. 611

The want of probable cause in such a case is a mixed question of law and fact.　　　　　　　　　　　　　　　p. 611

In such a case probable cause is such a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the party accused to be guilty. It is wholly immaterial whether the party was guilty or not, if the facts known to the defendant, and only

Md.]

known to him, were such as would warrant a cautious man in believing the party to be guilty.                    p. 612

While malice may be inferred from the want of probable cause, a want of probable cause may not be inferred from even the most express malice.                    p. 616

In an action for malicious prosecution, where the defendant in such action had caused the plaintiff to be arrested on the charge of conspiracy to defraud (by means of false certificates of weight as to several loads of hay), it was *held,* that the plaintiff had failed to establish want of probable cause and that he was not entitled to recover.                    p. 617

*Decided November 12th, 1913.*

Appeal from the Baltimore City Court (HARLAN, C. J.).

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Wm. H. DeCourcy Wright,* for the appellant.

*John S. Young* and *Eldridge Hood Young* (with whom was *Louis Hollander* on the brief), for the appellee.

BURKE, J., delivered the opinion of the Court.

This is the defendants' appeal from a judgment recovered by the appellee against them in a suit for malicious prosecution. The suit was brought against the W. J. Chapman Coal Company, a corporation, Horace Isaac, and the appellants. At the conclusion of the appellee's testimony the Court in-

structed the jury to find their verdict in favor of Isaac and the Coal Company, and thereupon the plaintiff submitted to a *non-pros* as to those defendants and the case proceeded against the appellants.

William J. Chapman is the president of the coal company, and G. Walter Jackson is the secretary. At the conclusion of the whole case the appellants asked the Court to direct a verdict in their favor upon the ground that the plaintiff had offered no legally sufficient evidence of a want of probable cause for the prosecution. The Court rejected this prayer. The first and most important question in the case is the propriety of the ruling upon that prayer. When such a prayer is offered at the end of all the evidence, both for the plaintiff and the defendants, "the Court must consider the whole evidence and not that of the plaintiff alone, for that offered by the defendant may supply any defect in the proof of the plaintiff. *The Consolidated Railway Co.* v. *Pierce,* 89 Md. 495. The prayer is a demurrer to the whole evidence. The Court in dealing with it will assume the truth of the facts adduced in support of the plaintiff's case, and it will consider such other facts appearing in the record which have been proved and not contradicted or denied by the plaintiff. The Court upon such a prayer must not assume to decide controverted questions of fact, but will leave all such facts to the determination of the jury. The rule by which the Court will be guided in considering such a prayer, offered after all the evidence is in, is thus stated by JUDGE ALVEY in the case of *Bacon* v. *Baltimore & Potomac R. R. Co.,* 58 Md. 482:

"For while it is perfectly true that where the plaintiff adduces evidence which, if uncontradicted, will justify and sustain a verdict, no amount of contradictory evidence, however strong, will justify the Court in withdrawing the case from the jury; yet, if it be proved as part of the plaintiff's case, or if it be otherwise proved, or not controverted or denied by the plaintiff, that the party injured or killed was clearly guilty of negligence in the occurrence of the accident,

and that such accident would not have occurred but for the negligence of the party injured, directly contributing thereto—in such case, the defendant is entitled to have the jury instructed that their verdict must be for the defendant. The facts are taken as established, and the question then becomes one of law for the Court, to be passed upon and decided as upon a demurrer to the evidence. There is no office to be performed by the jury unless there is a contest in regard to the material facts involved in the issue or question to be decided, and if the facts, sufficient in themselves to establish clearly the contributory negligence on the part of the party injured, be either admitted or shown in proof by the plaintiff while attempting to prove negligence on the part of the defendant, the Court is well justified in acting upon such proof as true and in directing the jury accordingly." This rule was applied in *Thelin* v. *Dorsey,* 59 Md. 539, and *Hooper* v. *Vernon,* 74 Md. 136, both cases of malicious prosecution. In *Thelin's case,* the Court said: "The law controlling a case of this kind is so fully and clearly expounded by this Court in *Boyd* v. *Cross,* 35 Md. 197; *Cooper* v. *Utterbach,* 37 Md. 318; *Stansbury* v. *Fogle,* 37 Md. 381; *Cecil* v. *Clarke,* 17 Md. 508; and *Medcalfe* v. *Ins. Co.,* 45 Md. 205, that we have only need in this case to reaffirm the principles therein announced. In substance those cases determine, that in order to enable the plaintiff to recover in a suit for malicious prosecution, he will be required, in addition to the fact that he was prosecuted and acquitted, to show that he was prosecuted at the instance of the defendants," and that such prosecution was both malicious and without probable cause on the part of the defendants." In is also fully settled in those cases, that "the want of probable cause is a mixed question of law and fact." "As to the existence of the facts relied on to constitute the want of probable cause—that is a question for the jury; but *what will amount to the want of probable cause in any case is a question of law for the Court.*" "If the evidence adduced be legally insufficient to be submitted to the jury to prove each of the elements of the plaintiff's case," his action will

"be pronounced groundless and the defendant not be called on for his defense." *Boyd* v. *Cross*, 35 Md. 196. All the cases referred to adopt the definition of JUDGE WASHINGTON in *Munns* v. *Dupont*, 3 Wash. C. C. 31, of probable cause. It is:

"Such reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves, to warrant a cautious man in believing the party accused to be guilty. It is wholly immaterial whether the party was guilty or not, if the facts known to the defendant, and only known to him, were such as would warrant 'a cautious man' in believing the party was guilty."

In the light of these principles, we will examine the material and uncontradicted facts appearing in the record, and in dealing with them we must, as stated in the case of *Hooper* v. *Vernon, supra,* consider them in the light in which they appeared to the defendants when they instituted the prosecution.

There was no evidence offered by the defendants which would aid the plaintiff upon the question of the want of probable cause, and that question must be determined upon the undisputed facts in evidence.

The plaintiff is a son of Charles M. Nash, who lived in Baltimore County, about twenty-five miles from the city, and who was engaged in the business of buying hay in the county and hauling it to Baltimore City and selling it to various purchasers. Among his purchasers was the Chapman Coal Company, to which he had sold hay for about two years prior to August 10, 1911, on which date the occurrences took place which led to the prosecution of the plaintiff and his father upon the criminal charge hereinafter mentioned. The plaintiff was then about nineteen years old and had been driving the hay wagon for about two years, and during those years no one else to his knowledge had hauled hay to the Coal Company for his father. The father owned two wagons which he used in hauling hay to the city; one of

these wagons was heavier than the other. The hay carriages
of the two wagons were different in color—that of the heavy
wagon was blue and that of the lighter one was red. Both
wagons had been weighed at the Fremont Street hay scales,
and their weight had been registered there. When the plain-
tiff brought in a load of hay to be delivered to the defend-
ants the method of ascertaining the amount of hay to be
paid for and the manner of collecting was this: The wagon
and hay were weighed together, and the plaintiff would tell
the weighmaster which wagon he was using. He would say
the lighter or the heavier one as the case might be. The
weighmaster would accept his statement and deduct the regis-
tered weight of the wagon which the plaintiff informed him
he was using from the gross weight, and the difference would
be the net weight to be paid for by the purchaser. The
weighmaster would give the plaintiff a ticket which showed
the net weight made up in this way. The ticket and hay were
then taken to the South Baltimore yard of the Coal Com-
pany, where the hay was unloaded and the ticket O. K'd. by
the superintendent of the Coal Company and taken by the
plaintiff for payment of the office of the company at Sharp
and Lombard Streets. The money was collected not by the
plaintiff, but by Charles M. Nash, his father, whose custom
was to go to the office after the ticket had been left there and
collect the money. The lighter wagon as shown by the weight
at the hay scales weighed 3,000 pounds and the heavy one
3,800 pounds. Within one year prior to August 10, 1911,
the plaintiff had delivered thirteen loads of hay to the Coal
Company and had presented tickets therefor which showed
the wagon to weigh 3,000 pounds. These tickets were
accepted as correct by the Coal Company, and the amounts
shown to be due were paid without question to Charles M.
Nash. On August 5, 1911, the Coal Company wrote to
Charles M. Nash saying that he might send in a load of
prime timothy hay the following week, and advised him
that the hay must be weighed and the certificate presented

from the State scales in the city. The prior thirteen deliveries had been certified to by others than the State inspectors. The plaintiff left home with a load of hay on the ninth of August and drove as far as Pikesville, where he spent the night, and on the morning of the tenth he proceeded to the Northwestern Hay Scales where the hay was weighed. He told the weighmaster that he was driving the lighter wagon, and was given a ticket which showed that 3,000 pounds were deducted from the gross weight. He then took the hay to the yard of the Coal Company, delivered the ticket, and unloaded the wagon. Mr. W. J. Chapman, one of the defendants, was present while the plaintiff was in the act of unloading. After Mr. Chapman had observed the wagon, he concluded that its weight was in excess of that stated in the certificate, and he asked the plaintiff to re-weigh the wagon, which the plaintiff promised to do. The plaintiff at that time knew that he had made a misstatement to the weighmaster as to the wagon, and that the weight shown upon the ticket was not correct, and that there was a shortage of 950 Mr. Chapman had at that time: "Q. You knew right then and there that it was the wrong weights, didn't you? A. Yes. Q. Did you tell him so? A. No, sir. Q. Then you knew when you left him that you had the wagon with the wrong weight? A. Yes. Q. And you never told him? A. No, sir. Q. Although he asked you what weight it was? A. The ticket showed that. Q. The ticket showed that, and he had brought it to your particular notice by asking you to go to the scales and have the wagon weighed? A. Yes. Q. You went right on up home? A. Yes; to tell my father and let him come down and attend to it." William J. Chapman testified that he asked the plaintiff if the weight shown on the ticket was correct, and that he said it was, and this testimony is not denied. Charles M. Nash testified that he knew the wagon used to haul this particular hay weighed 3,950 pounds, and that he told his son on August 9th to use the heavy wagon. Mr. Isaac, one of the members of the Coal Company, went to the

Northwestern Hay Scales to see the wagon weighed, but the plaintiff did not go to the scales, but continued on his way home without re-weighing the wagon. He was overtaken near Arlington by two members of the Coal Company and the wagon was weighed at that place, and it was found to weigh 3,800 pounds. It was then taken to the Northwestern Hay Scales where it was found to weigh 3,950 pounds, and where the ticket was corrected by the State inspector. Although the plaintiff, according to his own testimony, well knew at the time he delivered the hay that the weight of the wagon had been misstated, he made no mention of that fact then or when he was overtaken on the road. On the morning of August 11th, Charles M. Nash called at the office of the Coal Company and inquired what the trouble about the load of hay was, although it must be inferred that he well knew and was informed that it was short in weight, and asked for settlement on the corrected bill. William J. Chapman declined to settle, but told him to call in a few days, which he did. He testified that Mr. Chapman told him at that interview that he would not settle, but said, "If you will drop this load of hay, we will drop our side." He asked Mr. Isaac, the treasurer of the Coal Company, to pay for the amount of hay shown by the corrected bill, and said his son did not know the weight of the wagon, and that he should have told him. Charles M. Nash placed his account in the hands of an attorney for collection, and after some communication with William J. Chapman a suit was brought before a justice of the peace. Prior to the institution of the suit the Coal Company made a demand upon Charles M. Nash for alleged shortages amounting to $239.16 in hay delivered from August, 1909, to August 10, 1911, inclusive. On the day of the trial before the justice, December 13, 1911, G. Walter Chapman appeared before James W. Lewis, a police justice of Baltimore City, and swore out a warrant against the plaintiff and his father, charging them with a conspiracy to defraud the Chapman Coal Company of Baltimore, a corpo-

ration, for $11.87, current money, by means of false certificate of weight of the load of hay delivered to it on August 10, 1911. They were arrested and indicted by the Grand Jury in the Criminal Court of Baltimore upon this charge, and after a trial in that Court were acquited. The explanation offered by the plaintiff at the trial of his statement to the weighmaster that he was using the lighter wagon was that he had made a mistake. There was testimony offered tending to show that the defendants were actuated by malice in the institution of the prosecution, but such evidence can not be considered in determining the question of probable cause.

While malice may be inferred from the want of probable cause, a want of probable cause can not be adduced from the most express malice. "In the trial of actions of this nature," said Judge Washington, in *Munns* v. *Dupont, supra,* "it is of infinite consequence to mark with precision the line which the law will justify the defendant in going and will punish him if he goes beyond it. On the one hand, public justice and public security require that offenders against the law should be brought to trial and to punishment if their guilt be established. Courts and juries, and the law officers whose duty it is to conduct the prosecution of public offenders, must, in most instances, if not in all, proceed upon the information of individuals, and if these actions are too much encouraged, if the informer acts upon his own responsibility and is bound to make good his charge at all events, under the penalty of responding in damages to the accused, few will be found able and willing at so great a risk to endeavor to promote the public good. The informer can seldom have a full view of the whole ground and must expect to be frequently disappointed by evidence which the accused only can furnish. Even if he be possessed of the whole evidence he may err in judgment and in many instances the jury may acquit where to his mind the proofs of guilt were complete."

The question we are to determine is this: Were the facts we have stated such as justified the defendants as reasonable,

cautious men in believing the plaintiff and his father had entered into a conspiracy to defraud them? That such a fraud by the methods adopted in weighing the wagon might have been perpetrated with the greatest facility is evident. The wagon which weighed 3,950 pounds was represented as weighing 3,000 pounds, and the tickets for the thirteen prior loads delivered gave the weight of the wagon as 3,000 pounds. The son delivered the tickets and the father collected the money. The plaintiff testified that he gave the weight as 3,000 pounds by mistake. It is possible that this statement is true, but it is almost inconceivable that he did not know it was the heavier wagon, and his misstatements to Mr. Chapman, and his suppression of the truth at the time when it was his duty to have spoken truthfully, were most unfortunate for him. The facts and circumstances which are undisputed, and which were within the knowledge of the defendants at the time the warrant was sworn out, were well calculated to create in their minds the strongest suspicion, and in our opinion would have warranted a prudent and cautious man in believing, that a skilfully devised plan had been adopted by the defendants to defraud and cheat. We do not mean to say that any such plan or scheme did in fact exist. The plaintiff has been acquitted of the charge preferred against him. It is to be hoped that he was entirely free from any intent to do wrong, but the uncontradicted facts and circumstances which we have carefully weighed and considered have led us to the conclusion that under the legal principles governing this class of actions the plaintiff failed to show by any evidence legally sufficient for that purpose that the prosecution was instituted without probable cause. It follows that the defendants' prayer which asked for the withdrawal of the case from the jury should have been granted. This conclusion dispenses with the consideration of the other questions raised by the record.

*Judgment reversed, without a new trial, with costs to the appellants.*