ANNIE McNAMARA and EDWARD HILDEBRAND

*vs.*

RICHARD PABST.

*Malicious Prosecution—Punitive Damages—Assisting in Prosecution.*

A prayer asserting that if defendants assisted in procuring plaintiff's arrest and prosecution under such circumstances as would not have induced a reasonable and dispassionate man to undertake such a prosecution from public motives, then there was no probable cause therefor, and the jury might infer, in the absence of sufficient proof to satisfy them to the contrary, that the prosecution was malicious in law, *held* proper in the absence of special circumstances. pp. 468, 472

In an action for malicious prosecution, a prayer that if the jury find for plaintiff they may consider all the circumstances and award punitive damages, *held* proper, although such prayer did not require, as a condition precedent to the award of such damages, a finding of malice on defendant's part, since any verdict for plaintiff in such an action involves a finding of malice. pp. 472, 473

In the absence of evidence that the swearing out of the warrant by one defendant was directed or authorized by the other defendant, or that such other voluntarily aided or assisted in the prosecution, the case should be withdrawn from the jury as to the latter. pp. 474, 475

*Decided January 12th, 1921.*

Appeal from the Court of Common Pleas of Baltimore City (HEUISLER, J.).

Plaintiff's first prayer was as follows:

"The jury are instructed that if they find from the evidence that on or about the 10th day of May, 1918, the plaintiff was arrested and taken to the Northeastern Police Station

on a warrant charging him with having committed the crime of false pretenses; that on the 10th day of May, 1918, said charge was heard before James A. Dawkins, Esq., the magistrate then presiding at said police station, and after the conclusion of said hearing the plaintiff was committed to the Baltimore City Jail for the action of the Grand Jury of Baltimore City, if the jury so find; that said charge was dismissed by the said Grand Jury on the 10th day of May if the jury so find and shall further find that the defendants aided and assisted the procuring the arrest and prosecution of the plaintiff under such circumstances as would not have induced a reasonable and dispassionate man to have undertaken such a prosecution from public motives then there was no probable cause for said prosecution and the jury may infer, in the absence of sufficient proof to satisfy them to the contrary that said prosecution was malicious in law and their verdict may be for the plaintiff."

The cause was argued before BOYD, C. J., THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Eugene Frederick,* with whom was *Harry B. Wolf* on the brief, for the appellants.

*Edwin T. Dickerson* and *Harry W. Nice,* with whom were *J. Calvin Carney, C. Milton Dickerson,* and *Dickerson & Nice* on the brief, for the appellee.

THOMAS, J., delivered the opinion of the court.

This appeal is from a judgment in favor of the plaintiff in a suit for malicious prosecution, and the only exception in the record is to the ruling of the court below on the prayers.

The plaintiff, who states that he was a "first-class automobile mechanic," in May, 1918, owned a "Powerplus Indian" motorcycle of the 1907 model, for which, according to his testimony, he had paid $350.00, and which he had used for thirteen months. The plaintiff further testified that on Sat-

urday evening, May 14th, 1918, about 7 o'clock, he sold the motorcycle at his home to Edward Hildebrand, a young man about twenty years of age, and one of the appellants in this case, for $175; that he told Hildebrand that the motorcycle was "in absolute first-class condition" and agreed to give him instructions at 11 o'clock Sunday morning; that after Hildebrand agreed to take it he took Hildebrand and his friend a ride on it that night, and then took Hildebrand to his home, where he left the machine and where Hildebrand paid him $160 on account of the purchase price and agreed to pay the balance of $15 in the next two weeks; that the following Tuesday Hildebrand and his mother, Mrs. McNamara, came to his house to see him; that Mrs. McNamara told him that the machine was not in good condition, that some parts of it were broken, etc., and asked him to give her son back the money as he was dissatisfied with it; that when he told Mrs. McNamara that he would not "give the money back," she started to cry, and said she thought it was a dirty trick, and "that she was either going to get her money back or have" him "sent to jail," and that he told her she could "help herself"; that he saw Mrs. McNamara again the following day at his home, and that she again made the same statement to him; that he was arrested the following Friday and taken to the Northeastern Police Station, and that after a hearing, at which Mrs. McNamara, Hildebrand and Joseph Suzan testified, he was sent to the court house and from there to the Baltimore City Jail, where he remained until he was released on bail about 1 o'clock on the same day; that he did not testify before the police justice, who told him "that he would have to hold the case for court." The plaintiff also proved that he was "charged on the oath of Annie Mc-Namara with obtaining $160 * * * from Edward Hildebrand by means of false pretense on the 4th of May, 1918"; that Annie McNamara and Officer John Patterson were the names of the witnesses for the state on the commitment; that Hildebrand and Joseph Suzan were by order of the State's

Attorney subsequently summoned as State's witnesses before the Grand Jury, and that the case was dismissed by the Grand Jury.

According to the testimony of the defendants, Joseph Suzan told Hildebrand on the first Saturday in May, 1918, that the plaintiff wanted to sell his motorcycle, and Hildebrand went to the plaintiff's house that night with Suzan to buy it. The motorcycle was in the plaintiff's yard, and it was too dark for Hildebrand to examine it carefully that night. The plaintiff told Hildebrand that it was in a first-class condition, and that if it was not in that condition he would give Hildebrand "the money back." On Sunday morning Hildebrand discovered that the machine was not in good condition and that it could not be ridden, and on the same day he told the plaintiff that it was not in good condition and asked him to give him back the money and the plaintiff said he had spent it—bought a suit of clothes with it—and that he would not give it back. Mrs. McNamara did not see the motorcycle until Sunday morning, and after she saw it she and her son went to see the plaintiff at his home, and she asked the plaintiff to live up to his bargain, but he refused to return any of the money. After going to see the plaintiff and the plaintiff's mother, and after the plaintiff refused to return any of the money, Mrs. McNamara, according to her testimony, concluded not to bother about it any more, but her "insurance man, Mr. Wagner," happened to come in the next day and she told him about it and he advised her to go and see the squire at the station house and have a talk with him. She further testified that she accordingly went to the station house to see Justice Dawkins on Wednesday and explained the matter to him, and that he said he would issue a warrant; that she never made the threat testified to by the plaintiff; that she appeared before the justice of the peace on the day of the hearing, and that she was summoned to appear, but was not called, before the grand jury. On cross-examination she said that she told the

plaintiff's mother that if the plaintiff would return $100 he could have the motorcycle and keep the other $60, and that when she first saw the motorcycle that Sunday morning she told her son that it looked "like it was all broke." It further appears from the evidence that Hildebrand did not go to the station house with his mother on the day she swore out the warrant; that he was there on the day of the hearing because he "was summoned up there because" he bought the motor, and that he was not in the grand jury room. The testimony of Hildebrand as to the terms of the contract of . purchase was fully corroborated by Joseph Suzan, who testified that he told Hildebrand that the motorcycle was for sale, and went with him to the plaintiff's house Saturday night to purchase it. He said further that the plaintiff represented the machine to be in good condition, and told Hildebrand if he was not satisfied with it he would give him back the money. Officer Patterson, who arrested the plaintiff, testified that the plaintiff asked him if he could do anything for him, and that when he replied that it would depend upon "how he made the deal," the plaintiff said that the price was a "little stiff," and that he would have given some of the money back if they had not had him arrested.

The suit was brought against both Mrs. McNamara and Hildebrand, and at the conclusion of the testimony the plaintiff offered three prayers, which were granted, and the defendants offered three, only one of which, the third, was granted.

Plaintiff's first prayer was approved by this Court in *Torsch* v. *Dell,* 88 Md. 459; *Mertens* v. *Mueller,* 119 Md. 525, and *Mertens* v. *Mueller,* 122 Md. 313, and there are no special circumstances in this case to render the instruction improper.

The plaintiff's second prayer was not questioned in this Court, and his third prayer instructed the jury that "if the jury find their verdict for the plaintiff—they may take into consideration all of the circumstances of the case and award

such damages as will not only compensate the plaintiff for
the wrongs and indignities he has sustained in consequence
of defendants' wrongful acts, but may also award exemplary
or punitive damages as a punishment to the defendants for
such wrongful acts." It is earnestly contended by the appel-
lants that this prayer of the plaintiff, "disconnected as it is
with the other prayers, does not require of the jury, that, as
a condition precedent to the award of punitive damages,
malice must be found on the part of the defendants"; that
while a similar prayer was approved in *Mertens* v. *Mueller*,
119 Md. 525, the court there observed that it was taken from
*Torsch* v. *Dell, supra,* in which case the prayer was con-
ceded, and that in *Bernheimer* v. *Becker,* 102 Md. 250, the
only case in which the prayer was expressly passed upon, the
court held that it "was too broad because it did not require
the jury to find as a condition of awarding punitive dam-
ages that the alleged wrongs to the plaintiff had been inflicted
maliciously or wantonly or with circumstances of contumely
and indignity." While it is true that the prayer was con-
ceded in *Torsch* v. *Dell, supra,* and that the court in *Bern-
heimer* v. *Becker, supra,* held that the prayer was too broad
for the reasons stated in the language we have quoted, the
contention of the appellants here loses sight of the distinction
between a case for assault and battery and one for malicious
prosecution. In *Bernheimer* v. *Becker* there was a count in
the declaration for assault and battery, and the court was fol-
lowing the principle announced in *Sloan* v. *Edwards,* 61 Md.
89, as applicable to cases of assault and battery. But in suits
for malicious prosecution, as was said in *Mertens* v. *Mueller,*
119 Md. 536, "the gravamen of the action is malice," and
in order to recover the plaintiff must show that the "prosecu-
tion was both malicious and without probable cause." *Chap-
man* v. *Nash,* 121 Md. 608; 1 *Poe, Pl. & Pr.,* sec. 192. The
prayer in question was not only distinctly approved in both
of the cases of *Mertens* v. *Mueller* referred to, but received
the definite sanction of the court as early as *Stansbury* v.

*Fogle,* 37 Md. 369, where JUDGE MILLER said that the find-
ing of a "verdict for the plaintiff" necessarily included a
finding of everything necessary to support the action, includ-
ing a finding that the defendant "was actuated by malice."
There was no error in granting the plaintiff's prayers.

A more serious question is presented by the defendants'
first and second prayers. As we have said, the suit was
brought against Mrs. McNamara and her son, Edward Hilde-
brand, and the judgment is against both of them. To en-
title the plaintiff to such a judgment it was incumbent upon
him to show that they both participated in the prosecution,
and these prayers sought to withdraw the case from the jury
as to Hildebrand. No question is made in regard to the form
of these prayers, but the contention of the appellee is that
the testimony to the effect that the money paid for the ma-
chine belonged to Hildebrand; that he was present when his
mother, according to the statement of the plaintiff, made the
threats and did not protest; that he testified before the police
justice and was summoned to appear before the grand jury
is sufficient to justify a verdict against him. But the uncon-
tradicted evidence is that he attended the hearing before the
justice in obedience to a summons issued for him because he
sold the machine; that he was summoned to appear before
the grand jury, and that he did not accompany his mother
when she went to see the justice, and there is not the slight-
est evidence to show that he said anything on the occasions
when his mother went to see the plaintiff; that he did any-
thing to encourage her in the course she pursued, or that he
even knew of her visit to the justice until after the warrant
was sworn out. In the case of *Stansbury* v. *Fogle, supra,*
JUDGE MILLER said that "mere passive knowledge and con-
sent to the acts of another, is not sufficient to render a party
liable," and in the case of *Mertens* v. *Mueller,* 119 Md., at
p. 537, JUDGE STOCKBRIDGE, speaking for this Court, said:
"To hold an individual liable for malicious prosecution it is
not necessary that he shall have himself sworn out the war-

rant; all that is required is that he voluntarily aids or abets in the prosecution. *Gittinger* v. *McRae,* 89 Md. 513. If, therefore, there was any evidence tending to show that the swearing out of the warrant was directed or authorized by John W. Mertens, or that he voluntarily aided or assisted in the prosecution, a case was made out for submission to the jury. The defendant appeared both before the magistrate and in court at the trial of the case; but the uncontradicted testimony is to the effect that Mr. Mertens was summoned by the State's Attorney as a witness. This is not the voluntary aiding and abetting which the law contemplates." The same principle was recognized in the second appeal of *Mertens' case* in 122 Md. Applying the rule announced and followed in the cases referred to, which is the only safe rule, to the facts of this case, we fail to discover any evidence of such voluntary aid or assistance in the prosecution on the part of Hildebrand as could justify a verdict and judgment against him. On the contrary, all of the evidence tends to show that his mother, in the prosecution of the plaintiff, took matters entirely in her own hands, and, so far as her minor son was concerned, acted upon her own initiative and the advice of others. We think the case should have been withdrawn from the jury as to the defendant, Edward Hildebrand, and we will, therefore, under Chapter 229 of the Acts of 1920, reverse the judgment from which this appeal was taken as to him.

> *Judgment reversed as to Edward Hildebrand without a new trial, and judgment affirmed as to Annie McNamara, the appellee and Annie McNamara, each to pay one-half of the costs.*