JACK B. NANCE, ET AL. *v.* GLENN GALL

[No. 25, October Term, 1946.]

658

*Decided December 12, 1946.*

*Opinion modified March 13, 1947.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*R. Dorsey Watkins* and *James C. L. Anderson* for the appellants.

*Robert H. Archer* and *J. Cookman Boyd, Jr.*, with whom was *Robert H. Archer, Jr.*, on the brief, for the appellee.

GRASON, J., delivered the opinion of the Court.

This case was instituted in the Court of Common Pleas of Baltimore City by Glenn Gall against Jack B. Nance and Maryland and Pennsylvania Railroad Company, a corporation. The narr. charged: that defendants instituted a criminal prosecution against him; that the same was finally dismissed and that the prosecution was false and malicious and instituted by the defendants without probable cause. The defendants filed pleas, issue was joined thereon and the case went to trial before a jury and resulted in a verdict against the defendants in favor of the plaintiff for $8500. A combination motion *N.O.V.* and for a new trial, filed by the defendants, was overruled and a judgment entered on the verdict, from which defendants appeal.

The evidence shows that Nance was superintendent, and McClellan the chief engineer of the railroad com-

pany. The office of the railroad was at Oak Street and North Avenue, in the City of Baltimore. These officials of the railroad occupied the same office.

Gall is a sawmill and logging operator and conducts his business in an office at Belair Road and Gunpowder Falls. The building is about fifty feet ·from the road, and along the road are large signs, four by twelve feet, with his name across the same in letters sixteen inches high. He had been engaged in this business for fifteen years. He purchased certain trees standing on property owned by Mr. Hicks. This property abuts on the right of way of the railroad, in the vicinity of its station at Laurelbrook, and extends northerly to a county road that runs obliquely in a northeasterly direction to Fallston. These trees had been marked or blazed by the State Forester.

Along the right of way the railroad company had telephone and telegraph wires strung on poles· The railroad used this telephone system to communicate with the various stations along its road.

Gall stated he went over the land and "saw all the trees when I bought the timber." Some of the trees stood on a high elevation above the right of way of the railroad and if cut without being roped there was danger they might fall on the railroad tracks. He knew this "from personal observation when I bought the trees," and further stated: "* * * when I buy timber I look for the dangerous trees and take particular notice of them, and I had a pretty good idea where they are on the site." On June 12th or 13th, 1945, Gall called the office of the railroad and talked with McClellan about these trees. "I told him five or six trees were dangerous to cut along this right of way of the railroad; some were hanging over the railroad," and "I told him to see my man in the woods and he would show him which trees." McClellan told Gall that he would look at the trees and communicate with him, and thereafter he called Gall and stated that the railroad would rope the trees at his expense, but would only do it at his expense. Gall would

not pay the railroad for roping the trees and told Mc-Clellan to forget the matter. Gall says that he saw all of the trees he purchased but that he could not recall particularly any of the trees, except the six trees he described to McClellan and had seen before he talked to him.

William Lehman had twenty-five years' experience in cutting timber. He was employed by Gall to cut timber for him, and he hired his own men to help him. The timber was to be cut, split into logs, and hauled to Gall's place of business by trucks. On June 18, 1945, he was cutting timber at Laurelbrook, on this tract of land for Gall. He had cut one tree, which was logged, and then proceeded to cut a poplar tree, which fell on a telegraph pole, knocking it down, disrupting communication by telephone and telegraph. This tree stood about sixty feet north of the railroad right of way. It appeared to be perfectly sound. Lehman notched the tree on the side away from the railroad. He then sawed the tree on the side next to the railroad and drove wedges in the side which was sawed, and by this process the tree should have fallen up the hill and away from the railroad tracks. The tree was rotten on the inside and instead of falling the way Lehman intended it to fall, namely, up the hill and away from the railroad right of way, it broke off and fell on the telephone and telegraph pole, knocking it down, and the wires thereon, putting out of use the telephone and telegraph system. From the testimony, a clear inference can be drawn that it was the rotten condition of the tree that caused it to fall the way it did, and not the want of ordinary skill exercised by Lehman in cutting it.

It was admitted that Sidney D. Peverley, if present, would testify he has been engaged, all his life, in the timber business, which involved sawing, cutting and felling trees, and for a number of years has been a member of the State Forestry Board; he was familiar with the proper way of cutting timber and how to fell trees, and had practical experience in this kind of work since

boyhood. He saw the stump of this poplar tree. "The stump of this tree showed that it had been cut in a way that was intended to throw it in a northwesterly direction, away from the railroad, the notch having been made on the northwest side and it having been sawed and wedged from the southeasterly direction." Peverley further said: "I was shown a number of trees, I think at least six in number, which had been marked by the State Forester to be cut but were leaning toward the railroad and would have to be roped to prevent their falling on the track. None of these marked trees had been cut." He stated that the method of cutting the poplar tree was executed in the usual manner and with reasonable skill. Mr. Gall, Mr. Archer, Mr. Brown, a photographer, and Mr. Deaton, a surveyor, accompanied Peverley when he inspected the stump of the poplar tree and the other trees Gall had purchased.

After Nance discovered that the wires were down in the vicinity of Laurelbrook, he and McClellan drove to Bel Air and consulted Mr. H. Breckenridge Heaps, a lawyer with offices in that town. These gentlemen went to Bel Air via the Belair Road, and passed the office of Gall. They were in consultation with Mr. Heaps, at his office, for a period of from three to four hours. Mr. E. Paul McNabb, the State's Attorney for Harford County, was called to Mr. Heaps' office by him and introduced to Nance and McClellan. These three gentlemen were in this law office until Mr. McNabb left.

Mr. McNabb was called as witness by the plaintiff. He testified as follows: That Heaps asked him to read Section 535 of Article 27 of the code. After a discussion of the matter by all parties present, Heaps asked McNabb his opinion regarding the right to take out a warrant under the section referred to. McNabb says he was told a conversation was held between McClellan and Gall, in which a disagreement arose as to how certain trees should be cut and thrown so as not to fall on the railroad tracks, and that notwithstanding that conversation some trees had been cut by Gall's employees and

they were in the act of cutting those trees along the railroad tracks at the time. He says he was told that no trees had been seen on the tracks, but that fresh poplar leaves, as well as some twigs from a tree, were found on the tracks, which indicated that a tree had fallen thereon; that the telephone wires had been broken and communication disrupted. He told them his opinion was that if they cared to take out a warrant they were within their rights, but he did not advise the taking out of the warrant. While he was there, there was a discussion by the three other gentlemen concerning the institution of a proceeding to enjoin further cutting of the trees. He wasn't certain why they wanted an injunction but, according to his testimony, the inference seems to be it was abandoned because the court wasn't sitting in Bel Air on that day. Mr. McNabb further stated he understood from them "that the cutting of trees was still in progress down there on that particular afternoon; and from the conversation, it was my opinion that, or I took from Mr. Nance's conversation, rather, that there had been some apprehension of the trains being stopped by the falling of these trees." "Q. I mean, was that an apprehension of their being stopped following their talk with you, is that it? A. Yes, sir.

"Q. In the future? A. Yes, sir. * * * I felt at the time that the breaking of the wires was part of the railroad's system as contemplated by the Act, and I expressed myself in that way." He does not recall being told that the wires had been repaired and the telephone was in service again. "I think there was some statement made that one train had—that a train had gone through. I don't recall whether it was supposed to have gone through before those trees were cut or after, I am not sure about that." He had "no information as to whether it was one or more than one tree that had been cut. * * * My recollection is that more than one tree was discussed. I don't have any independent recollection of reference being made to a state or county road. * * * there was some reference made to other trees standing close along

that track. * * * there were a number of trees along there that were contemplated cutting." They told him of a conversation between McClellan and Gall, in which reference was made to several trees, "five or six as I recall it, or more, and that all of these trees had not been cut, they were in the act of cutting them at that time, as I understood, only a number of them up to that time had been cut, and that's what I understood them to mean, whether they should get out an injunction to stop the cutting of the rest of them or not; but that conversation (about the injunction) was not with me. * * * I did understand from them that a rather serious condition existed down there with reference to the operation of the railroad tracks and that they did want to take care of the railroad tracks and the safe conduct of the trains through there, that certain acts had already been done which they were considering as being within the statute, and other acts were in progress at that time. Q. Were in progress? A. That is, I mean cutting of additional trees."

Magistrate Spencer, who testified for the plaintiff, was called to Heaps' office after Mr. McNabb left, and met Mr. Nance and Mr. McClellan there. He was told of the happening at Laurelbrook that morning and of the conversation between McClellan and Gall, and that there wasn't much satisfaction gotten out of the conversation so far as the railroad was concerned. He was led to believe "that it was a proposition whereby something should be done about it. * * * there had been certain trees cut there which had gotten on the right-of-way; there were also other trees which were going to be cut, probably were cutting them. * * * it was a continuous proposition, that they were going ahead and cutting these trees." He stated that he got this information from Heaps, McClellan and Nance, and that there was some talk of an injunction, but it was too late to get an injunction that afternoon because the judge wasn't there. It was between three and four o'clock in the afternoon at that time. He further testified: "In my

own mind, it was more or less a continuous proposition. If there hadn't been any damage done that afternoon, the next morning, if they had started to cut the trees, by the time the court opened, to have possibly prepared and gotten an injunction would have taken several hours, and I was thinking about the safety of the general public traveling on the railroad. * * * The fact that there had already been some damage to the railroad company, and the further fact that I didn't know what was going to happen, is the reason that the warrant was issued." He went to his office, prepared a warrant, and returned to Heaps' office where the warrant was discussed with Heaps in the presence of Nance and McClellan. The warrant was then given to the sheriff, who went to the office of Gall and arrested him, took him to Bel Air, and he was held in custody for some time before he was released for a hearing. This warrant is as follows:

"State of Maryland, Harford County, to wit:

"To Charles T. Stephens, Sheriff of said County, Greetings:

"Whereas, complaint has been made before me, the subscriber, one of the justices of the peace of the State of Maryland, in and for said County, upon information and oath of J. B. Nance, who charges Glenn Gall with having on the 18th day of June, 1945, committed the crime of having placed trees on the Maryland & Pennsylvania Railroad, calculated to obstruct, overthrow or direct from the track of said Railroad cars traveling or passing thereon, in violation of Section 535 of Article 27 of the Public General Laws of Maryland.

"You are therefore commanded immediately to apprehend the said Glenn Gall and bring him before me, the subscriber, or some other justice of the said State in and for said County as aforesaid, to be dealt with according to law. Hereof fail not and have you then and there this warrant.

"Given under my hand and seal this 18th day of June, in the year of our Lord, 1945.

"S. S. Spencer, J. P. (Seal)"

Section 535, Art. 27, Code 1939, provides:

"If any person shall place anything, or cause anything to be placed on any railroad in this State, calculated to obstruct, overthrow or direct from the track of such railroad any car, vehicle or carriage, traveling or passing on such railroad, or shall break or injure in any manner any railroad in this State, with the view or intent to obstruct or overthrow any car, vehicle or carriage, such person so offending shall be deemed guilty of felony, and upon conviction thereof shall be sentenced to the penitentiary for not less than two years nor more than ten years."

The witness Crouse hauled logs in a truck from this property near Laurelbrook to the sawmill of Gall, down next to the Gunpowder Falls. He went to the woods that morning between 8:30 and 9 o'clock and the poplar tree in question had been cut down. He cut a limb off this poplar tree and it fell down over the fence along the right of way of the railroad. He threw this limb back over the fence, loaded his truck with logs, returned to the mill, at about 10:30 or 11 A. M., and advised Gall what had happened. When Gall got this information he immediately stopped the cutting of all trees close to the railroad tracks. The testimony shows that there was a tree standing near the county road, that was thereafter felled, and that some of its branches scraped high tension wires of the gas company, but did not break them as it fell across the road. This tree was so far away that it could not possibly have interfered with the tracks of the railroad company. The testimony of the plaintiff further shows that the trees that Gall talked to McClellan about roping, and which were dangerous, were not cut. The only tree cut that day, about which the railroad company could complain, was the poplar tree heretofore mentioned.

A hearing was had on this warrant, before Magistrate Spencer, and Gall was dismissed. At the hearing the prosecution was conducted by the State's Attorney, but Heaps was present during most of the time of the hearing. Nance, McClellan and an employee of the railroad

company testified. They were summoned by the State to appear for the hearing.

From these facts it appears that Gall talked with McClellan over the telephone regarding the roping of certain trees that he wanted to cut on the land referred to. Thereafter, MClellan told Gall over the telephone that the railroad would rope certain trees at his expense. Gall thought that the railroad should do this work at its own expense and refused to pay it for roping the trees. On June 18th, 1945, Gall's woodsman started to cut trees. One was cut and its falling in no way injured the railroad. A large poplar tree, standing about sixty feet from the northernmost rail of the track was cut. The land from the track up to and beyond this tree ascended so that the tree did not stand near a cut or on a hill that would make its cutting dangerous to the railroad right of way. This tree appeared perfectly sound and had been marked, or blazed, by the State Forester. The manner of cutting it was that of a skillful woodsman. The evidence shows that it would have fallen away from the railroad tracks if it had been sound, but because the tree was decayed, which could not be seen by the workmen, it fell towards the railroad tracks, knocked down the telegraph and telephone pole with wires thereon, and disrupted the company's system of communication. A limb of this tree, after it was felled, might have extended over the tracks of the railroad, but it was cut off by a workman and the tracks were not obstructed. After the condition at Laurelbrook became known to Nance and McClellan, they went to Bel Air and consulted Mr. Heaps. They passed the office of Gall, but did not stop in to ask him about the matter. After the poplar tree was cut Gall stopped the cutting of all trees that could possibly fall on the railroad tracks. Nance and McClellan, as shown by the testimony narrated above, led both State's Attorney McNabb and Magistrate Spencer to believe that the cutting of the trees adjacent to the railroad tracks was continuing and Nance caused the issuance of the warrant set out above. He denies that he actually swore out the warrant and relies on this as a

668

defense of both himself and the railroad company. In this connection he sets up that he, McClellan and Irwin, an employee of the railroad company, were summoned as witnesses for the State and at the hearing the State was represented by the State's Attorney. Heaps, counsel for Nance and the railroad company, was present at the hearing and remained there until it was nearly over.

In *Stansbury v. Fogle,* 37 Md. 369, it is stated:

"While mere passive knowledge and consent to the acts of another, is not sufficient to render a party liable, (*Gilbert v. Emmons,* 42 Ill. 143, 89 Am. Dec. 412), yet voluntary aid and assistance undoubtedly will. The first prayer of the appellee in *Cooper v. Utterbach,* 37 Md. 282, approved by this court, was to the effect, that if the jury found from the evidence that the defendant aided and assisted in procuring the arrest and prosecution of the plaintiff, and aided and contributed to said prosecution, then he is liable to be sued by the plaintiff in this action, provided, the jury under the instructions of the court, shall find the other facts necessary to render him so liable. So in *Cotton v. Huidekoper,* 2 Pen. & Watts 149, the court states what is unquestioned law, 'if the defendant participated voluntarily in the prosecution of the plaintiff and it was carried on with his countenance and approbation, he is liable in damages, whether there were other who were concerned in it or not'."

"The law is very well settled that, one who does not swear out the warrant cannot be held liable in an action for malicious prosecution unless he '* * * had instigated a criminal action against the plaintiff, or had caused one to be maintained, or had voluntarily aided or assisted in its prosecution.' "

*Fertitta v. Herndon,* 175 Md. 560, 566, 3 A. 2d 502, 120 A.L.R. 1317; *Angelozzi v. Cossentino,* 160 Md. 678, 155 A. 178, 180; *Stansbury v. Fogle,* 37 Md. 369, 384, 385; *Gittinger v. McRae,* 89 Md. 513, 515, 517, 43 A. 823; *Johns v. Marsh,* 52 Md. 323; *McNamara v. Pabst,* 137 Md. 468, 112 A. 812; *Mertens v. Mueller,* 119 Md. 525, 87 A. 501.

The testimony does not admit of a doubt that Nance aided and abetted in the institution of this prosecution and he is responsible, therefore, if the other elements necessary to make out a case of malicious prosecution are established. In such state of the proof neither Nance nor the railroad company (if it should be held it is responsible for his act in instigating this prosecution) can take shelter behind the fact that he was summoned as a witness to appear at the hearing, nor that the State's Attorney represented the State at that time. This prosecution ended in the dismissal of the charge by the magistrate, and Gall was thereby exonerated from the charge contained in the warrant. This result of the hearing before the magistrate establishes the falsity of the charge, and supports an inference that the prosecution was motivated by malice and want of probable case. This inference could have been rebutted by proof that facts and circumstances, sufficiently strong in themselves, were known to defendants, together with such facts as would have been discovered by an investigation, which in common sense and fairness should have been made, were such as to induce a cautious and careful man to believe Gall guilty of this charge; then there was probable cause for the institution of the proceeding and the defendants would not be liable in this case.

In *Stansbury v. Fogle, supra,* which has been repeatedly affirmed by this court, the definition by Mr. Justice Washington, of "probable cause" in *Munns v. De Nemours,* Fed. Cas. No. 9926, 3 Wash. C. C. 31, was adopted. It is as follows:

"A reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in his belief that the person accused is guilty of the offense of which he is charged."

If the facts or inferences to be drawn therefrom are clear and undisputed, the question is one of law for the court, but if the evidence or the inferences to be drawn therefrom are disputed, it becomes a mixed question of law and fact, the court instructing the jury as to what in law is probable cause, or the want of probable cause,

the jury finding the facts. *Stansbury v. Luttrell,* 152 Md. 553, 556, 557, 137 A. 339, and authorities cited. Without narrating the testimony hereinbefore cited, we are of the opinion that the question of whether there was probable cause for the issuance of the warrant in this case was a matter properly left to the jury.

It is contended that appellants acted under advice of counsel. One is not protected by the advice of counsel in a case such as this unless he communicates to counsel "all the facts bearing upon the guilt or innocence of the accused, which he knew, or by reasonable diligence could have ascertained. * * * The theory of the appellant, that the correctness of the opinion, or the reasons or grounds on which he based it, were not in issue, would be correct in a case where all the facts were divulged; the better opinion being, where such is the case, the prosecution is not liable to an action for a malicious prosecution, even if the facts did not warrant the advice and prosecution. * * * But the advice of counsel cannot protect where there has been a '*suppressio veri,*' or '*suggestio falsi.*' " *Cooper v. Utterbach,* 37 Md. 282; *Sappington v. Fairfax,* 135 Md. 186, 194, 108 A. 575; *Moneyweight Scale Co. v. McCormick,* 109 Md. 170, 72 A. 537; *Torsch v. Dell,* 88 Md. 459, 41 A. 903; *Hyde v. Greuch,* 62 Md. 577.

It is apparent from the testimony of Mr. McNabb and Mr. Spencer that the question of whether or not Nance told them all the facts known to him and such other facts that he might have known by the exercise of reasonable diligence, was one for the consideration of the jury, and we think that the case against Nance was properly submitted to the jury.

This brings us to the question of whether the case made out against the railroad should have been submitted to the jury. This depends upon whether Nance, as its superintendent, had general authority to act for the railroad company and hence bind it and expose it to all the consequences flowing from the taking out of the warrant in this case. If he had no such general authority, then the question would arise, did he have express authority from or did the railroad company expressly ratify his

act in taking out the warrant?

"If the prosecution was previously authorized or subsequently ratified, or if within the scope of the servant's or agent's employment, the employer or principal is liable; otherwise he is not." 34 Am. Jur. section 89, page 758 and note 16 for citation of authorities. Among the cases cited are *Central R. Co. v. Brewer*, 78 Md. 394, 28 A. 615, 27 L.R.A. 63; *Carter v. Howe Mach. Co.*, 51 Md. 290, 34 Am. Rep. 311.

This section goes on to state:

"A distinction is to be made in this connection, however, between those cases in which the action of the agent could have no effect other than the punishment of the offender, and those in which the act was done with a view to the recovery of the principal's property or the protection of his business. * * * the trend of the decisions is against holding the principal liable when the prosecution is instituted after the supposed crime has been committed, and not for the protection of his property or interests; in such cases the agent has been presumed to act on his own account, for the vindication of justice, and there is no liability on the part of the employer unless there is shown either that there was express precedent authority for doing the act, or that the act has been ratified and adopted."

To the same effect, see 77 A.L.R., page 929, and authorities cited.

In *Carter v. Howe Mach. Co., supra,* quoting Mr. Justice Blackburn in *Allen v. R. R. Co.,* L. R. 6 Q. B. 65, it is said:

"There is a marked distinction between an act done for the purpose of protecting the property by preventing a felony or of recovering it back, and an act done for the purpose of punishing the offender for that which has already been done. There is *no implied authority* in a person having the custody of property to take such steps as he thinks fit to punish a person who he supposes has done something with reference to the property which he has not done. The act of punishing the offender is not anything done with reference to the property;

it is done merely for the purpose of vindicating justice."

In *Central R. Co. v. Brewer, supra* [78 Md. 394, 28 A. 616], where *Carter v. Howe Mach. Co.* was referred to and relied on, it was said:

"There is nothing in the record which directly or indirectly tends to show that the superintendent was acting in pursuance of express precedent authority from the defendant (51 Md. 290, at page 298, 34 Am. Rep. 311) in causing the arrest of the plaintiff, nor had he any implied authority for so doing, arising out of the scope of his employment, so far, as least, as the testimony in the record discloses. The fact that he had general authority to look after and manage the affairs of the defendant, in running its cars on the streets of Baltimore City for the carriage of passengers, in no manner suggests that he had, unless expressly authorized so to do by his principal, any authority to arrest a passenger for placing in the fare box a leaden nickel in payment of his fare. He may have a general authority to look after and protect the property of the defendant, *and he may possess all the powers properly pertaining to such employment; and yet he would not be empowered to invoke the aid of the criminal law on behalf of his company, unless he had express precedent authority.*" (Italics supplied here.)

To the same effect *Beiswanger v. American Bonding & Trust Co.*, 98 Md. 288, 57 A. 202, where the Carter and Central R. Co. cases were cited with approval.

Nance knew that a tree near Laurelbrook had been cut and that it fell on a pole on which the railroad company's telephone and telegraph wires were strung, knocking it down and disrupting, temporarily, its telephone and telegraph communication; that a part of a limb of this tree probably projected over the tracks and that it had been cut off, and that there was no obstruction to the movement of railroad trains over the tracks; that these wires had been connected temporarily; that Irwin told him that trees were still being cut but he did not ask Irwin if trees were being cut so near the railroad tracks that they might fall thereon; that a tree some distance from the railroad tracks, and which could not have pos-

sibly fallen thereon, was cut near the county road and struck some high-tension wires, but did not knock them down; although he passed directly in front of Gall's office, he did not stop to inquire from Gall what the situation was at the scene where this poplar tree had been cut; he did not go to look at the poplar tree that had been cut. It would seem to be a reasonable inference that if Nance had stopped and talked to Gall as he passed his office on his way to Bel Air, and had gone to the scene of the trouble, he would have known perfectly well that there was no obstruction of the railroad tracks at that time and that Gall was not contemplating cutting trees so close to the railroad's right of way that would endanger or obstruct trains.

"Even if there were circumstances of suspicion in the mind of the defendant which might have been readily removed or explained by reasonable and proper inquiry, and there was no inquiry made, such circumstances cannot be made the ground for showing the existence of probable cause." *Johns v. Marsh,* 52 Md. at pages 336, 337.

It would seem to be clear that when the prosecution in this case was initiated Nance knew, or should have known by reasonable inquiry, that there was nothing being done at that time by Gall that would obstruct the free passage of trains along the railroad tracks. The only act which was done by Gall through his agents, was the cutting of the poplar tree, and this tree was cut hours before the criminal proceeding was instituted. It is evident that the prosecution was predicated on an act which had been done and completed. As there was no obstruction to the trains on the tracks thereafter, the prosecution was based on a past event, and it cannot be said that it was instituted for the protection of the railroad's property. As Nance did not have general authority to institute this prosecution, and as there is no evidence in the case that he had express authority, or that his act in instituting the prosecution was ratified by the railroad company, the demurrer prayer on behalf of the company,

which directed the court to withdraw the case from the jury as to the railroad, should have been granted.

In the charge to the jury the court referred to the proceeding as a case of false imprisonment. Thereafter it corrected this and told the jury that it was a case of malicious prosecution and not one of false imprisonment. The exception as to this is based on what we might call the slip of the tongue of the trial court. It is trivial and totally without merit.

We have examined the exceptions taken to the evidence, and without extending this opinion, it is sufficient to say that we do not think there appears reversible error in any of the rulings upon evidence. We consider that the charge to the jury by the court, insofar as the defendant Nance is concerned, is clear, correct, and presented the case fairly to the jury. For the reasons stated, the judgment entered against the defendant Nance will be affirmed and the judgment entered against the railroad company is reversed, without a new trial.

> *Judgment as to Nance affirmed, with costs; judgment as to Maryland and Pennsylvania Railroad Company reversed without a new trial, with costs.*

GRASON, J., filed the following opinion, granting motion for modification of opinion:

On December 12, 1946, this court rendered an opinion in this case, wherein the judgment was reversed without a new trial, as to the corporate defendant, and affirmed as to the individual defendant, Nance. He now files a motion for modification of the opinion, and the main ground for the motion is that the verdict of the jury solely reflects punitive damages, and that it would not have inflicted such punishment upon Nance if the action had been instituted solely against him; that the verdict was a joint verdict as to Nance and the railroad and was intended as a punishment not only of Nance but of the railroad, and if it stands it would, therefore, be unjust.

The appellee answered this motion and asserts that Nance could have protected himself at the trial by offering evidence as to his financial responsibility and inasmuch as no evidence of that character was offered, there was no reason to suppose that the judgment of $8,500.00 as to him, was an excessive punishment for the wrong he committed against appellee.

There was no evidence in this case that appellee sustained compensatory damages through the act complained of. The jury's verdict was purely a punitive one. It could be sustained on no other theory, because if the law required in such a case (which it does not) proof of compensatory damages, the appellee would have suffered no loss. As we pointed out in our opinion, appellee improperly joined the railroad company with Nance in this action. The verdict which the jury rendered was a joint verdict and it could not have been apportioned as to the two defendants. The question now before us is whether the judgment as to these defendants should be allowed to stand solely against Nance.

The case of *Schloss v. Silverman*, 172 Md. 632, 192 A. 343, 348, involved a civil action for damages resulting from an assault and battery. Silverman sued Toney Schloss and Dan Schloss, as co-partners and as individuals. The judgment in that case was reversed by this court as to Toney Schloss and as to the partnership, without a new trial, and was reversed as to Dan Schloss and a new trial awarded. The evidence showed that the financial worth of the partnership was $68,038.78—the financial worth of Dan Schloss's interest in it was $7,686.17. Judge Offutt said: "The jury may therefore in awarding exemplary damages and determining the amount which would sufficiently punish the defendants have been influenced by the net worth of the two individual defendants and the partnership. And since it cannot be assumed that they attempted to make the 'punishment fit the crime,' rather than the offenders, it does not follow that they would have awarded the amount in exemplary damages against one defendant worth less

than $8,000, that they did against three worth over $68,000." See 143 A.L.R. 31.

Appellee argues that Nance knew that punitive damages might be assessed against him as the case below was tried on that theory, and that the record is devoid of any suggestion that Nance was entitled to or sought separate consideration in the matter of damages. But the jury could not apportion its judgment so as to make a part of it applicable to Nance and a part applicable to the railroad company. It could only render a joint judgment, and each would be responsible for the entire judgment. In the following cases, cited by appellee, financial worth was offered as to several defendants: *Washington Gas Light Co. v. Lansden,* 172 U. S. 534, 19 S. Ct. 296, 43 L. Ed. 543; *Strand v. Griffith,* C. C., 109 F. 597. He also quotes *Minnis v. Friend,* 360 Ill. 328, 196 N. E. 191. But the cause of action in that case was based upon injuries he received when a City (of Chicago) fire truck collided with Friend's automobile. This case involved compensatory damages and not punitive damages.

In *McNamara v. Pabst,* 137 Md. 468, 112 A. 812, the point here involved was not considered.

The question here presented was not called to our attention by Nance when the case was argued in this court on appeal from the judgment entered below. We think that the rule laid down in *Schloss v. Silverman, supra,* and in the cases cited by appellee, should be extended to and apply to this case even though no evidence was offered by appellants as to the financial worth of either Nance or the corporate appellant. That the appellee wrongfully impleaded the corporate defendant cannot be denied and we have so held, and he should not be benefited by a verdict that probably would not have been rendered had the suit been instituted solely against Nance. In *Washington Gas Light Co. v. Lansden, supra* [172 U. S. 534, 19 S. Ct. 303], it was said: "The plaintiff, in bringing his action, saw fit to join the gas company and several of its officers as individual defendants. He could, had he so chosen, have brought his action against the company

alone. All the defendants joined in a plea of not guilty, and the jury could not find a verdict of guilty against all, and apportion the damages among the several defendants by giving a certain amount as against the company and a certain amount as against the individual defendants."

We cannot free ourselves of the impression that the jury intended, by its verdict, to inflict punishment on both the corporate and individual defendants, and would not have rendered the verdict it did if the action had been instituted solely against Nance. We do not think that a judgment rendered against two defendants should be imposed alone upon one of those defendants. Under the joint Tort Feasor Act (Code, Article 50) he could have collected from the other defendant one-half of the judgment to be paid. To let the judgment stand against him alone would take from him this possible recoupment. *E. H. Koester Bakery Co. v. Poller,* 187 Md. 324, 50 A. 2d 234.

The second point in the motion is, namely: "Acquittal by a trial magistrate constitutes a favorable termination, but is no evidence of want of probable cause." Our opinion discussed fully and ruled on the element of probable cause in connection with the evidence in the case, which we will not modify.

For the reasons given, the motion for modification of the opinion will be granted.

> *Motion granted, judgment against Maryland and Pennsylvania Railroad Company reversed without a new trial; judgment against Jack B. Nance reversed and new trial awarded, costs to be paid by Appellee.*